Argued and submitted July 9, reversed December 5, 2007,
petition for review allowed March 26, 2008 (344 Or 390)

Kevin L. LAMSON,
*Plaintiff-Respondent,*

*v.*

CRATER LAKE MOTORS, INC.,
an Oregon corporation,
*Defendant-Appellant.*

Jackson County Circuit Court
042609L3; A130759

173 P3d 1242

Timothy C. Gerking argued the cause for appellant. With him on the briefs were Mark R. Weaver and Brophy, Mills, Schmor, Gerking, Brophy & Paradis, LLP.

Edward H. Talmadge argued the cause for respondent. On the brief were Arne I. Cherkoss, Mark D. Clarke, and Frohnmayer, Deatherage, Pratt, Jamieson, Clarke & Moore, P.C.

Before Edmonds, Presiding Judge, and Wollheim and Sercombe, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Plaintiff initiated this action against defendant, his former employer, alleging that he was wrongfully discharged for complaining about and refusing to participate in a new and used car sales event conducted on defendant's property. Plaintiff's claim was tried to a jury, and the jury returned a verdict in favor of plaintiff. Defendant appeals, arguing that the trial court should have granted its motion for a directed verdict, that the court erred in instructing the jury, and that the court erroneously allowed the jury to consider evidence of what occurred at the sales event. For the reasons stated below, we conclude that the trial court should have granted the motion for a directed verdict, and we therefore reverse the judgment.

Because the jury found in favor of plaintiff, we state the facts in the light most favorable to him. *Boothby v. D.R. Johnson Lumber Co.*, 341 Or 35, 38, 137 P3d 699 (2006). From 1989 until his termination in 2004, plaintiff was a sales manager for defendant, a car dealership. Plaintiff was a good employee and was generally happy with his job. He particularly valued defendant's philosophy that "customers come first." In plaintiff's view, defendant was unique in the car dealership industry in that respect and was known for its less aggressive sales approach. Defendant also had a reputation among its own employees for adhering to a high standard of ethics and integrity.

In September 2003, with sales lagging, defendant hired an outside sales firm, Real Performance Marketing Company (RPM), to conduct a sales promotion at defendant's dealership. The contract provided that RPM would focus primarily on used car sales and would bring its own sales force. The promotional event was to run for five days, from November 19 to November 23, 2003 (the November 2003 sale).

Plaintiff became concerned when he heard about the upcoming sale. He was particularly apprehensive about the prospect of a third party taking over the sales office and determining prices for customers. He was also concerned because he had heard from other people that RPM was "kind

of high pressure, they might do some things that [he] might not agree with." Nonetheless, plaintiff testified that he approached the November 2003 sale with an open mind.

Plaintiff was present for the first two and a half days of the sale. During that time, he personally observed or was informed of a number of activities that he considered to be unethical or unlawful or both. For instance, before the November 2003 sale, RPM created a video that was sent to potential customers. It represented that all vehicles would be reduced in price; plaintiff believed that that representation was misleading, because the only vehicles that turned out to be reduced for purposes of the sale were the vehicles in the video. Plaintiff also believed, among other things, that RPM salespersons were misrepresenting the sale as a "bank sale," and that RPM was attempting to "pack the payments," *i.e.*, provide customers with an inflated monthly payment that included, without the customers' knowledge, things such as life insurance, gap insurance, and service contracts.

On the third day of the November 2003 sale, plaintiff reported those practices by RPM that he believed to be unethical or unlawful to defendant's general manager, Bill Shevlin. Shevlin told plaintiff that he "should just go home then[,]" and plaintiff left the sale. The following week, defendant held a meeting to discuss the results of the November 2003 sale. At that meeting, plaintiff again detailed his concerns that RPM had engaged in unethical and illegal activities. He stated that, "[i]f [he] had to do business that way, how RPM did it, [he'd] get out of the car business."

On January 2, 2004, following a regularly scheduled sales meeting, plaintiff was summoned to Shevlin's office. Shevlin began the meeting with plaintiff by criticizing plaintiff's recent performance and attitude. He told plaintiff that plaintiff no longer picked up trash around the dealership or said "thank you" to other employees. He also complained that plaintiff was being outsold by Tom King, another sales manager, "per retail by $600.00 a car." Shevlin subsequently drafted a note for plaintiff's personnel file that recapped the contents of the meeting, including Shevlin's criticism of plaintiff's sales numbers and treatment of other employees. Plaintiff, for his part, examined the sales records for 2003

and found that the difference between his sales and King's sales "was less than $100.00 per retail, per car deal."

During that same January 2 meeting, Shevlin informed plaintiff that defendant was going to have another RPM sale in March 2004 and asked plaintiff if he was planning to quit rather than participate in the sale. Plaintiff told Shevlin that he needed the job and was not going to quit. Plaintiff then said, "Bill, it sounds like you don't want me here anymore." Shevlin responded, "You're right, I don't. I don't want the [plaintiff] that's been here the last two years." Shevlin told plaintiff that his attendance at the upcoming RPM sale was mandatory and that he needed to let Shevlin know whether he was going to participate.

When plaintiff returned to work on January 5, he delivered a letter to defendant's owner, Jim Coleman, about the RPM sale planned for March. Plaintiff delivered the letter to Coleman rather than Shevlin because he believed that Shevlin was "trying to get [him] to quit." The letter began,

> "This letter is a response to the direct order from Bill Shevlin General Manager Crater Lake Motors Inc. on January 2nd 2004 for my mandatory participation in the upcoming R.P.M. sale the first week of March 2004. I am basing my decision not to participate in this event on the following convictions."

The letter then recited various parts of defendant's policies and procedures manual regarding ethics, customer satisfaction, and sales protocol. The letter concluded:

> "I personally viewed 2 full days of R.P.M.'s consistent misrepresentation, fraudulent action, deceit, lying, immoral conduct, unethical conduct, and illegal actions. In my conversation with Bill on the 2nd of January, he himself described them as Carnies. It is with this assumption that all of the values, ethics, morals, and honorable dealings Crater Lake Motors and me as a representative of Crater Lake Motors has always stood for will once again be compromised.

> "It is discouraging beyond words to think that after nearly 15 years I find I am now working for a Company that is adopting sales tactics that totally contradict its Policies and Procedures Manu[a]l. In my opinion it was adherence

to the high ethical standards contained in that Manu[a]l that has given Crater Lake Motors, Jim Coleman, and its employees the fine reputation it enjoys in Southern Oregon. I question whether you are willing to sacrifice this reputation by going forward with this ill advised direction we are now heading. I encourage you to rethink this profit at any cost mentality, and reaffirm the policies that Crater Lake Motors has adhered to in the past. Jim Coleman, his employees, and the community will be better off for that decision."

Approximately one week later, plaintiff met with Coleman. Plaintiff again raised his concerns about RPM's practices. At the close of that meeting, Coleman delivered a letter to plaintiff. That letter stated,

"Thank you for your letter of January 5, 2004. Communication between employees and management is very important to Crater Lake Motors, and we appreciate your concerns. Please rest assured that Crater Lake Motors intends to continue its objective of treating customers with the highest ethical standards.

"However, the present concern is not with the business operations of Crater Lake Motors, but rather with your duties as an employee. As a sales manager, you need to be a part of the team, including the upcoming RP[M] sale. You do not have the discretion to refuse to participate in this event.

"If you fail to participate in this event, according to the schedule set by management, Crater Lake Motors will have no choice but to take appropriate disciplinary action, including, but not limited to, discharge. If you would like to discuss this matter further, please do not hesitate to contact me. We look forward to your positive cooperation in this scheduled RPM sale."

Plaintiff then went on vacation. When he returned, he informed Coleman that he would not be participating in the March 2004 sale. He provided Coleman with another letter that stated,

"Thank you for taking the time to talk to me about the previous RPM sale. I feel that my duties as a sales manager at Crater Lake Motors ha[ve] been, and will continue to be in accordance with Crater Lake Motors Inc. Policies & Procedures Manu[a]l concerning customers. I feel our past,

present, and future customers deserve honest and fair dealings, not how they were treated as stated to you in my previous letter Jan. 5th, 2004 during the last RPM sale. It is with this conviction I am basing my decision not to participate in the upcoming RPM sale or any other RPM sale in the future."

He further explained to Coleman that he believed "that if [he] work[ed] the second sale, [he would be] condoning what happened at the first sale." Coleman told plaintiff that changes were going to be made that would prevent the practices that occurred during the first sale. He told plaintiff that, in the contract with RPM for the March 2004 sale, defendant would add language to the effect that RPM would not make misrepresentations to defendant's customers.

At some point, the contract between RPM and defendant for the March 2004 sale was, in fact, amended. A provision was added to the contract that stated, "THERE WILL BE NO MISREPRESENTATIONS OR ILLEGAL STATEMENTS MADE OR IMPLIED TO CRATER LAKE MOTORS CUSTOMERS." (Uppercase in original.) Plaintiff told Coleman that contractual language would be inadequate to remedy the problem. Coleman also told plaintiff that he wanted him to be at the sale to protect defendant and defendant's customers. Plaintiff responded, "I did last time. I went, I told Bill, he told me to go home. * * * I can't imagine it being any different." According to plaintiff, Coleman told him that he would talk to Shevlin and that either Shevlin or Coleman would get back to him.

During the weeks leading up to the March 2004 sale, plaintiff did not have further dealings with Shevlin or Coleman regarding his participation in the sale. On the dates of the sale, March 3 to March 7, plaintiff did not show up for work. He did not call Coleman, Shevlin, or anyone in the office during those days. On March 8, the day after the sale, plaintiff showed up for work at his regular time. At that point, Shevlin informed him that he was being terminated for not showing up for work during the sale.

After being terminated, plaintiff brought a claim against defendant for wrongful discharge.[1] In his operative complaint, plaintiff alleges, among other things, that he

---

[1] In his original complaint, plaintiff also brought claims for defamation and intentional interference with prospective employment relations. He later voluntarily dismissed the claim for intentional interference with prospective employment

"did not want to participate in the March 2004 RPM sale for the reason that the sales tactics employed by RPM violated public policy and Oregon law, specifically, unlawful trade practices pursuant to ORS 646.608. By reporting RPM's violations of unfair trade practices to [defendant's] President and owner, plaintiff was fulfilling an important societal obligation."

He further alleges that his

"refusal to participate in the March 2004 RPM sale was based on his belief that RPM would continue to employ illegal and unethical sales tactics similar to those used in the November 2003 RPM sale. By refusing to participate in RPM's March 2004 sale Plaintiff was fulfilling or desiring to perform an important societal obligation."

After realleging those facts under his wrongful discharge claim, plaintiff alleges:

"[Defendant] discharged Plaintiff because:

"(a)   Plaintiff reported RPM's unethical and illegal sales tactics which were in violation of [defendant's] company policy and Oregon's unlawful trade practices under ORS 646.608; and

"(b)   By reporting these violations, Plaintiff was performing an important societal obligation in that he was attempting to stop the unethical and unlawful trade practices which RPM was utilizing; and

"(c)   By refusing to participate in RPM's March 2004 sale at [defendant], Plaintiff was performing an important societal obligation by refusing to aid[ ] RPM in committing unlawful trade practices in violation of Oregon law."

At the close of the evidence, defendant moved for a directed verdict on plaintiff's wrongful discharge claim on various grounds, including that

"there is no evidence in the record that [p]laintiff refused to participate—or complained or refused to participate in the March 2004 sale, because of direct instructions or orders to either violate the company's code of ethics, or to violate the Uniform Trade Practices Act. And it's our belief that there must be threats or coercion or orders or instructions for the

relations, and the trial court granted a motion for a directed verdict on his claim for defamation. Only plaintiff's wrongful discharge claim is at issue in this appeal.

employee to engage in wrongful, illegal conduct in order for there to be a claim under these circumstances for wrongful discharge."

The court denied the motion, ruling that the jury would be required to decide "whether the [d]efendant discharged [p]laintiff because [p]laintiff performed or attempted to perform an important societal obligation." The court further explained that it had crafted the jury instructions in that way and that the jury would be instructed that it "must find that [p]laintiff was fulfilling an important societal obligation by complaining about and refusing to participate in what has been referred to as the second RPM sale." The jury was so instructed and returned a verdict in favor of plaintiff. The trial court then entered judgment in favor of plaintiff, and defendant appeals.

In its first assignment of error, defendant argues that the trial court should have granted a directed verdict because there is no evidence that plaintiff was fired for fulfilling an important public duty. More specifically, defendant argues that the undisputed evidence establishes that plaintiff would not have been fired if he had worked the sale as requested by defendant and that plaintiff's refusal to report to work did not, under the circumstances, fulfill an important public duty. In response, plaintiff argues that defendant ignores his allegations that he "was terminated for not only refusing to participate in a sale that employed illegal and unethical tactics, but also because he actively complained about the illegal and unethical sales tactics and attempted to bring them to an end."

■   The question before us is whether the trial court should have granted a directed verdict on plaintiff's theory that he was fulfilling an important public duty by complaining about and refusing to participate in the March 2004 sale. Although Oregon generally follows the at-will employment rule, the discharge of an at-will employee "may be deemed 'wrongful' (and, therefore, actionable) under certain circumstances." *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002). Examples of those circumstances include:

"(1) when the discharge is for exercising a job-related right that reflects an important public policy, *see, e.g.,*

*Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978) (employee unlawfully discharged for filing workers' compensation claim); or (2) when the discharge is for fulfilling some important public duty, *see, e.g.*, *Delaney v. Taco Time Int'l*, 297 Or 10, 681 P2d 114 (1984) (employee discharged for refusing to defame another employee); *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975) (employee discharged for serving on jury)."

*Babick*, 333 Or at 407. Unless plaintiff can demonstrate that his discharge was based on one of those exceptions to the at-will employment rule, his discharge is not actionable at common law.

■ In this case, plaintiff's wrongful discharge claim is predicated on the second exception, termination for "fulfilling some important public duty." In determining whether plaintiff's employment was terminated because he fulfilled an important public duty, "[t]his court cannot create a public duty but must find one in constitutional or statutory provisions or case law." *Love v. Polk County Fire District*, 209 Or App 474, 483, 149 P3d 199 (2006) (quoting *Eusterman v. Northwest Permanente, P.C.*, 204 Or App 224, 229-30, 129 P3d 213, *rev den*, 341 Or 579 (2006)). It is not enough that the provisions or cases "express a general public policy; rather, they must encourage specific acts or 'otherwise demonstrat[e] that such acts enjoy high social value.'" *Eusterman*, 204 Or App at 230 (quoting *Babick*, 333 Or at 409).

In *Love*, we recently explored the scope of the "important public duty" exception. We examined three cases in which Oregon courts have attempted to identify an important public duty, beginning with our opinions in *Anderson v. Evergreen International Airlines, Inc.*, 131 Or App 726, 886 P2d 1086 (1994), *rev den*, 320 Or 749 (1995), and *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 879 P2d 1288 (1994), *rev dismissed*, 321 Or 511 (1995). In *Anderson*, the defendant, an airline, discharged the plaintiff, one of its maintenance engineers, because he refused to violate a number of Federal Aviation Administration (FAA) regulations. We held that, in refusing to violate those safety regulations, the plaintiff had been discharged for fulfilling an important public duty. *Anderson*, 131 Or App at 734.

We then contrasted the facts in *Anderson* with those in *Banaitis*. *Love*, 209 Or App at 484. In *Banaitis*, a bank employee was discharged for refusing to divulge clients' financial information to another bank. The bank employee refused the requests of his superiors on the ground that it would be "against bank policy, against the law and unethical." *Banaitis*, 129 Or App at 374. "In 'finding' a public duty in that case, we relied on numerous statutes and rules that reflect the 'public interest in protecting the confidentiality of commercial financial records.'" *Love*, 209 Or App at 484 (quoting *Banaitis*, 129 Or App at 378). We also rejected the bank's argument that, unlike the FAA regulations in *Anderson*, the cited statutes and rules did not specifically apply to the bank employee's conduct:

> "'[I]t is not necessary that a statute specifically regulate the conduct that precipitated the discharge. We review statutes and other authorities for evidence of a substantial public policy that would * * * be 'thwarted' if an employer were allowed to discharge its employee without liability.'"

*Love*, 208 Or App at 484 (quoting *Banaitis*, 129 Or App at 380).

We next discussed the Supreme Court's decision in *Babick*, which "further defined the sources and contours of the 'important public duty' exception." 209 Or App at 484. In *Babick*, the defendant hired the plaintiffs, private security guards, to provide security at a rock concert. At the concert, the plaintiffs arrested or attempted to arrest certain concertgoers for various crimes and were terminated for those actions. The plaintiffs argued that, by enforcing criminal laws, they were fulfilling an important public duty. The defendants, in response, asked the Supreme Court to repudiate our analysis in *Banaitis* and to instead hold that an important public duty exists only where a statute or other source of law "imposes a specific legal obligation on the employee to act in the way that precipitates the discharge." 333 Or at 409.

The Supreme Court declined to repudiate our analysis in *Banaitis* because, even under that analysis, the plaintiffs had failed to establish the existence of a relevant public duty. The *Babick* court explained that

"expressions of a public desire for law and order are far too general to support [the] plaintiffs' 'public duty' theory. We are concerned here with a duty to perform a specific act (the arrest of lawbreakers by private citizens or private security personnel), and the statutes cited have nothing to say about that kind of act."

333 Or at 409. The court further explained:

"[The penal] statutes, on their face, are neutral on the essential issue, which is whether the law encourages law enforcement action by private individuals or security personnel or otherwise demonstrates that such acts enjoy high social value."

*Id.*

After reviewing the holdings in *Anderson, Banaitis,* and *Babick*, we attempted in *Love* to synthesize the relevant principles from the three cases:

"In combination, *Anderson, Banaitis,* and *Babick* establish that a public duty may be 'found' through cases, statutes, rules, or constitutional provisions that either (1) specifically encourage or require a particular action or (2) 'otherwise demonstrat[e] that such act[ion] enjoy[s] high social value.' *See Eusterman*, 204 Or App at 230 (so stating) (brackets in original). The first category is—at least—relatively objective, but the second is, seemingly, more impressionistic. As noted, in *Banaitis*, we held that the social value of protecting confidential financial information for commercial enterprises was of sufficient importance that a bank employee had a duty not to violate that confidentiality. The quality and magnitude of that social value was manifested in various statutes prohibiting, and even criminalizing, misappropriation of such information in various circumstances. Conversely, however, in *Babick*—despite the fact that the Oregon Criminal Code prohibited the acts for which the concertgoers were arrested, and despite the fact that citizens are *permitted* to make forceful arrests for such crimes—the Supreme Court concluded that the plaintiffs, in arresting law breakers, had not fulfilled an 'important social duty.' "

*Love*, 209 Or App at 486 (emphasis in original). We further observed:

"In *Babick's* wake, we must conclude that, for purposes of wrongful discharge, the class of conduct that is deemed to 'enjoy high social value' is very narrowly circumscribed. Nevertheless, that class consists *at least* of (1) conduct that, by statute or rule, is explicitly described as being of high social value; and (2) conduct that is similar to that giving rise to legally compelled obligations to act in other, analogous contexts. However, it is also apparent from *Babick* that general public concern over a particular social problem (*e.g.*, the use of controlled substances in *Babick*) does not necessarily give rise to a protected 'important public duty' to act, regardless of how ostensibly laudable the actor's efforts may be."

209 Or App at 486-87 (emphasis in original).

With the above principles in mind, we turn to the facts in this case. Preliminarily, we observe that plaintiff's wrongful discharge claim has two components: (1) that he was terminated for complaining about the RPM sales tactics and (2) that he was terminated for refusing to work at the March 2004 sale. At trial, plaintiff testified as follows regarding his complaints and his subsequent refusal to work the March 2004 sale:

"[DEFENDANT'S COUNSEL]: You'll agree that Mr. Coleman never ridiculed you, or admonished you, or became upset with you, when you complained about the sale that occurred in November of 2003?

"[PLAINTIFF]: No. He did not.

"[DEFENDANT'S COUNSEL]: And you'll agree that Mr. Shevlin never belittled you, warned you, or became upset when you complained about the sale?

"[PLAINTIFF]: No, I don't—you're talking the first one?

"[DEFENDANT'S COUNSEL]: Yes.

"[PLAINTIFF]: No, I don't think he did.

"[DEFENDANT'S COUNSEL]: And neither one of them told you to keep your opinions or your complaints to yourself.

"[PLAINTIFF]: Not that I know of.

"* * * * *

"[JURY QUESTION]: Though no one ever directed you to engage in unethical practices, did you feel that there was an implied directive or order to look the other way and conduct the sales blindly?

"[PLAINTIFF]: No, I don't think it's a matter of looking the other way. I think that when—I mean my job was hiring and training sales people, you know. And when I hired them and I trained them, I would give them stipulations on what my rules and regulations were if you were gonna work for us. You don't lie to me, you don't lie to a customer, bottom line. You get like a three strike thing. If I find out, we gonna go talk to the customer, and you don't do it again. You know, because I felt, you know, integrity in the car business is hard to come by. And it's a slow process of building customers over time that you can be honest and straight forward in the car business and be successful at it.

"I felt by allowing them [RPM] into the store, not knowing what their sales people were saying, seeing some of the things take place and allowing them back in again, I was condoning it. And I felt that if Crater Lake Motors customers, or any customers were to come in and I'm there, I'm giving my approval for them to be there, because I'm the manager of the store."

On appeal, plaintiff conflates the two components of his claim and argues that the evidence is sufficient to "support[ ] the jury's verdict that [plaintiff] was discharged for complaining about and refusing to participate in a sale where illegal and unethical sales tactics were being employed." For purposes of our analysis, we treat the two components separately and then consider them together to determine whether plaintiff's evidence is legally sufficient to support a wrongful discharge claim.

We begin by addressing the theory that plaintiff was discharged for complaining about RPM's sales tactics. We do so cautiously, however, because, in response to the first assignment of error, plaintiff does not cite any cases or statutory or constitutional authority for the proposition that internal complaints regarding an employer's wrongdoing, standing alone, serve an important public duty.[2] Rather, he

---

[2] Nor does plaintiff contend that defendant had engaged in criminal activity or that he was terminated for reporting such criminal activity. *See* ORS 659A.230(1)

simply argues that, "[s]hortly after [plaintiff] voiced his complaints regarding the illegal and unethical sales tactics being employed by RPM, [d]efendant began laying the groundwork for his termination." Although the exact nature of his contention is unclear, one possible reading of plaintiff's argument is that this evidence is sufficient to establish that defendant's proffered reason for termination—that plaintiff failed to show up for work—was a pretext, and that the motivating factor for termination was that plaintiff had complained about RPM's sales tactics.

■    Even assuming that the evidence is sufficient to support a "pretext" theory, plaintiff has not established that his internal complaints to defendant served an important societal obligation recognized by the law of wrongful discharge. We have acknowledged, in some circumstances, the "existence of an important public duty to 'blow the whistle' on certain behavior even in the absence of a specific statutory obligation to do so." *Love*, 209 Or App at 487. That is, "exposing certain statutory or regulatory violations, including health and safety violations, is sufficiently 'important' that, under certain conditions, an employee who does so is protected from being discharged for that conduct." 209 Or App at 487. In each of those cases, however, the complaint has addressed a significant issue related to health or safety. *Love*, 209 Or App at 488 (cover-up of a fatal workplace accident as part of safety investigation); *Dalby v. Sisters of Providence*, 125 Or App 149, 153, 865 P2d 391 (1993) (reporting pharmacy record-keeping inaccuracies involving substances that "could be harmful to the public"); *Hirsovescu v. Shangri-La Corp.*, 113 Or App 145, 831 P2d 73 (1992) (reporting nursing home patient abuse); *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or App 107, 110, 684 P2d 21, *rev den*, 298 Or 37 (1984) (same). In contrast, where the internal report of suspected

("It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person, has in good faith caused a complainant's information or complaint to be filed against any person, has in good faith cooperated with any law enforcement agency conducting a criminal investigation, has in good faith brought a civil proceeding against an employer or has testified in good faith at a civil proceeding or criminal trial.").

wrongdoing has involved private interests and not the interest of the public, we have held that a wrongful discharge claim is not available. *See Sieverson v. Allied Stores Corp.*, 97 Or App 315, 319, 776 P2d 38, *rev den*, 308 Or 382 (1989) ("[T]his case involves a report of suspected wrongdoing within a private corporation. We conclude that such action does not involve interests of public importance equal or analogous to those that have been recognized as constituting the tort [of wrongful discharge].").

■      As we explained in *Love*, "the class of conduct that is deemed to 'enjoy high social value' is very narrowly circumscribed" in the wake of *Babick*. 209 Or App at 486-87. Here, plaintiff's complaints involved issues related to misleading sales tactics that he believed violated defendant's internal policies and procedures and, in some cases, Oregon's Unlawful Trade Practices Act (UTPA), ORS 646.608 to 646.656. The legislature's general concern about consumer protection, however, does not, in itself, specifically require internal reports of wrongdoing by employees or otherwise suggest that those reports enjoy the protection furnished to "whistle blowers" in other contexts. On that question—whether employees should make internal complaints about unlawful trade practices—the UTPA is silent.

Nor can we conclude, in light of *Babick*, that plaintiff's internal complaints of unlawful sales practices are of the same public importance as the reports of health and safety violations in our earlier case law. Here, plaintiff did not report or threaten to report RPM's activities to anyone *outside of defendant*, and there is no evidence that defendant intended to "silence" him in a manner that would conceal illegal activities. *Cf. Love*, 209 Or App at 496 (threatening to report abuse of patients held actionable where discharge "stems from an effort by an employer to keep an employee from making a complaint to the proper authorities"). On these facts, we cannot conclude that plaintiff's internal complaints about defendant's use of a sales firm serves a societal duty that is more important than preventing (by means of a lawful arrest) the assaultive behavior and illegal drug possession at issue in *Babick*. Thus, we conclude that plaintiff's

internal complaints, standing alone, did not serve an important societal obligation for purposes of a common-law wrongful discharge claim.[3]

■ We turn next to plaintiff's theory that he was terminated for refusing to participate in a sale that involved unethical and unlawful sales tactics. According to plaintiff, his refusal to participate in the March 2004 sale involves a "duty to refrain from carrying out an act or a course of action" similar to that in *Delaney*, 297 Or at 14-17. In *Delaney*, the plaintiff was terminated after refusing to sign a false and arguably tortious statement casting aspersions on the work habits and moral behavior of a former coworker. The Supreme Court held that, under Article I, sections 8 and 10, of the Oregon Constitution, "a member of society has an obligation not to defame others." 297 Or at 17. Thus, the court held that the employer was liable for wrongfully discharging the plaintiff for refusing to sign the potentially defamatory statement. *Id.* Similarly, in *Anderson* and *Banaitis*, this court recognized an important public duty to refrain from performing acts that the employees believed to be unlawful. This case, however, differs from *Delaney*, *Anderson*, and *Banaitis* in a key respect: Plaintiff was not directed— expressly or implicitly—to do anything unlawful or unethical. In fact, the evidence is undisputed that plaintiff was told to attend the event to *prevent* unlawful and unethical acts.

■ Plaintiff's reliance on the UTPA is unavailing in this context as well. The relevant inquiry is not whether the prevention of unlawful trade practices is a matter of public concern. The question is whether plaintiff's particular act— refusal to report for work because he did not want to condone unlawful trade practices—is the type of act that the law encourages or that otherwise enjoys high social value. And, in that regard, ORS 646.608 (and the rest of the Unlawful Trade Practices Act, for that matter) is, like the criminal statutes at issue in *Babick*, "neutral on the essential issue." 333 Or at 409. *See also Eusterman*, 204 Or App at 233-34 (statutes

---

[3] This is not to say that complaints about unlawful trade practices can never serve an important public interest. We simply conclude that, on the facts of this case, plaintiff's internal complaints do not rise to the level of public importance necessary to support a claim for wrongful discharge.

relating to regulation of physicians and requiring physicians to practice medicine safely and skillfully were too general to immunize the physician's professional judgment from review by his employer). As we stated in *Love*, it is "apparent from *Babick* that general public concern over a particular social problem * * * does not necessarily give rise to a protected 'important public duty' to act, regardless of how ostensibly laudable the actor's efforts may be." 209 Or App at 487.

In sum, the evidence, viewed in the light most favorable to plaintiff, does not establish a legally cognizable basis for a claim for wrongful discharge. The employment relationship between plaintiff and defendant was an at-will employment relationship, which meant that plaintiff could be discharged for any reason, unless the discharge was for exercising a job-related right reflecting an important public policy or for fulfilling an important public duty. Here, the evidence is undisputed that plaintiff was not explicitly or impliedly directed to participate in any unlawful activity and was told to attend the 2004 sales event to watch for and report unlawful activity. Even if defendant's actions, viewed together as plaintiff posits, were pretextual because defendant no longer desired to employ plaintiff and expected that he would not attend the March 2004 sale, plaintiff was not discharged for fulfilling what the law would recognize as an important *public* duty. In other words, defendant took no action concerning plaintiff that amounted to a tort under the applicable law regarding at-will employment relationships. Regardless of whether plaintiff's refusal to work on the ground that his presence would "condone" RPM's sales tactics was laudable, his actions do not fall within the narrowly defined exceptions created by the law of wrongful discharge, and defendant's conduct is not actionable in a court of law.

For all of the reasons stated above, the trial court should have granted defendant's motion for a directed verdict.[4]

Reversed.

---

[4] Because we reverse on this ground, we need not address defendant's assignments of error regarding the jury instructions and the trial court's ruling on its motion *in limine*.