Argued and submitted September 17, 2008, decision of Court of Appeals affirmed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings August 20, 2009

Kevin L. LAMSON,
*Petitioner on Review,*

*v.*

CRATER LAKE MOTORS, INC.,
an Oregon Corporation,
*Respondent on Review.*

(CC 04-2609-L3; CA A130759; SC S055625)

216 P3d 852

Edward H. Talmadge, of Frohnmayer, Deatherage, Jamieson, Moore, Armosino and McGovern, P.C., Medford, argued the cause and filed the brief for petitioner on review.

Timothy C. Gerking, of Brophy, Mills, Schmor, Gerking, Brophy and Paradis, LLP, Medford, argued the cause and filed the brief for respondent on review. With him on the brief was Mark R. Weaver.

Dana L. Sullivan, of McKanna Bishop Joffe and Sullivan, LLP, Portland, filed the brief for amicus curiae Oregon Trial Lawyers Association.

Lindsey H. Hughes and Susan J. Mahoney, of Keating Jones Hughes, P.C., Portland, filed the brief for amicus curiae Oregon Association of Defense Counsel.

GILLETTE, J.

## GILLETTE, J.

In this wrongful discharge action, plaintiff seeks review of a Court of Appeals decision overturning a jury verdict in his favor. Plaintiff argues that, contrary to the Court of Appeals' view, his discharge was tortious, because he was fired for engaging in conduct that fulfilled an important societal obligation. For the reasons set out below, we reject that argument and affirm the decision of the Court of Appeals.

When this court reviews a grant of a directed verdict, which, according to the Court of Appeals, the trial court should have entered in this case, we view the facts in the light most favorable to the party opposing that motion—in this case, plaintiff. *See Boothby v. D.R. Johnson Lumber Co.*, 341 Or 35, 38, 137 P3d 699 (2006) (using that standard). Plaintiff worked as a sales manager for defendant, a car dealership, for some 15 years before he was fired in 2004. Plaintiff liked working for defendant; he particularly appreciated the dealership's low pressure approach to selling cars and, in his own words, its "high degree of ethics and integrity." Plaintiff generally was a good employee and had no negative reviews or comments in his employment file.

In September 2003, the dealership hired an outside sales firm, Real Performance Marketing (RPM), to conduct a five-day special event, the focus of which would be selling used cars. Under the contract between defendant and RPM, RPM would promote and manage the event and provide its own manager and sales force. Defendant's employees were not required to participate in the event but, if they did participate, RPM's manager would process their sales. The agreement between RPM and Crater Lake contained, *inter alia*, provisions that (1) asserted that RPM had "developed certain professional methods to successfully manage sales events"; (2) promised to put on a sale and "coordinate[ ] every aspect of the sale"; (3) promised to provide an "Event Sales and Management Team," including a "sales closer"; (4) stated that the relationship of the "team" to Crater Lake "will be that of independent contractor"; (5) promised that RPM would furnish "up to 10 salespeople to supplement [Crater Lake's] sales staff"; and specified (6) that "the parties agree

that their relationship will, at all times, be that of independent contractor and client." Crater Lake did not retain any right to control the actions of RPM or its employees at the sales event.

When plaintiff learned about the RPM event, he was apprehensive about "somebody taking over our sales office and dictating to our sales people and * * * customers." Plaintiff also was concerned because he had heard that RPM was prone to use questionable sales practices. Still, plaintiff told the dealership's upper management that he would attend the event and keep an open mind.

Plaintiff attended the first three days of the event. During that time, he observed RPM staff engaging in sales tactics that in his view were unethical and/or illegal, including misrepresenting the event as a "bank sale," marking cars with inadequate and potentially misleading pricing information, "packing" monthly payments with various insurance and service contracts without the customers' knowledge, and tricking customers into signing forms that authorized RPM to run credit checks.[1] On the third day of the event, plaintiff complained to the dealership's general manager, Shevlin, about the unethical conduct that he had been observing; Shevlin told him to "just go home." The next week, at a meeting of the dealership's managers, plaintiff again voiced his concerns about RPM's tactics and methods, and he specifically mentioned some of the conduct that he had observed during the first three days of the sales event. Plaintiff told the other managers, including Shevlin, that "if I had to do business that way, how RPM did it, I'd get out of the car business."

Several weeks later, Shevlin called plaintiff into his office after a regular managers' meeting. Shevlin complained to plaintiff that he had changed, that he "didn't say thank you anymore," that he was being outsold by as much as $600 per vehicle by another sales manager, and that he "just wasn't getting the job done." He then told plaintiff that the dealership would be having another RPM sales event in March

---

[1] Plaintiff also learned that, prior to the sale, RPM had sent a video to certain potential customers that misrepresented the price reductions that applied during the sales event.

2004, and that he wanted to know if plaintiff intended to quit. Plaintiff told Shevlin that he needed his job and was not going to quit, and then added, "It sounds like you don't want me here anymore." Shevlin then responded, "You're right, I don't. I don't want the [plaintiff] that's been here the last two years." Shevlin then insisted that he needed to know by the following Monday if plaintiff intended to attend the RPM sale or to quit.

Plaintiff thereafter wrote and delivered a letter to the dealership's owner, Coleman. In the letter, plaintiff attempted to explain why plaintiff had decided not to participate in the RPM sales event, in spite of Shevlin's ultimatum. The letter first quoted portions of the dealership's policies and procedures manual, generally to the effect that employees were expected to deal fairly and honorably with customers and to avoid unethical and illegal conduct. It then stated that plaintiff had observed "consistent misrepresentation, fraudulent action, deceit, lying, immoral conduct, unethical conduct and illegal actions" during the first RPM event and that plaintiff was discouraged that defendant would consider adopting such sales tactics. The letter ended by encouraging Coleman to "rethink this profit at any cost mentality, and reaffirm the policies that [defendant] has adhered to in the past."

A week later, Coleman met with plaintiff and the two men talked about plaintiff's concerns about the RPM event. At the end of that meeting, Coleman handed plaintiff a letter that stated that the dealership "intend[ed] to continue its objective of treating customers with the highest ethical standards," stated that plaintiff's participation in the upcoming RPM event was mandatory, and warned that if plaintiff failed to participate, "[we] will have no choice but to take appropriate disciplinary action, including, but not limited to, discharge."

Plaintiff responded to Coleman in yet another letter, which he personally delivered to Coleman on February 2—a few weeks before the scheduled RPM sale. In the letter, plaintiff stated his intention to continue to deal honestly and fairly with the dealership's customers and concluded: "It is

with this conviction I am basing my decision not to participate in the upcoming RPM sale or any other RPM sale in the future." Coleman tried to talk plaintiff out of that decision: He told plaintiff that the dealership's contract with RPM had been amended to provide that RPM would not engage in misrepresentations[2] and that Coleman would like plaintiff to be at the sale to make sure that unethical conduct did not occur. Plaintiff could not be persuaded. He believed that, if he worked at the second sale, he would be condoning what occurred at the first sale and would "lose [his] integrity as a salesman." In the end, Coleman told plaintiff that he would talk to Shevlin and that either he or Shevlin would get back to him. It appears, however, that plaintiff had no further discussions with Shevlin or Coleman about the matter until after the RPM sales event occurred.

The RPM sales event occurred as scheduled on Wednesday, March 3 through Sunday, March 7, 2004. Plaintiff did not come to work during the RPM sales event and did not call into the office. On March 8, 2004, the day after the event ended, plaintiff arrived at the dealership at his regular time. Shevlin called him to his office and informed him that he was being terminated for failure to report to work on the preceding days.

Plaintiff then filed the present action for wrongful discharge.[3] In his complaint, plaintiff alleged that he had been discharged for refusing to participate in the March 2004 RPM event and for reporting RPM's unethical and illegal sales tactics at the October 2003 event to Coleman and Shevlin. Plaintiff further alleged that both his refusal to participate and his reports to upper management fulfilled an important public purpose—specifically, that "by reporting these violations, plaintiff was * * * attempting to stop the unethical and unlawful trade practices which RPM was utilizing," and that "by refusing to participate in RPM's March 2004 sale * * *, plaintiff [was] refusing to aid RPM in committing unlawful trade practices in violation of Oregon law."

---

[2] In fact, the contract between defendant and RPM was amended to prohibit misrepresentations and illegal statements.

[3] Plaintiff's original complaint contained additional claims, which are no longer part of the case.

The case proceeded to trial. The jury heard testimony from plaintiff, Shevlin, Coleman, and other employees of the dealership. At the close of evidence, defendant moved for a directed verdict on plaintiff's wrongful discharge claim. In the motion, defendant observed that there was no evidence or allegation that defendant had ordered plaintiff to himself violate the company's code of ethics, the Uniform Trade Practices Act, or any other legal standard. Defendant then argued that there must be threats or coercion or orders or instructions for the employee to engage in wrongful, illegal conduct in order for there to be a claim under these circumstances for wrongful discharge. The trial court denied the motion, ruling that an employee may have a wrongful discharge claim if he or she is discharged for fulfilling an important societal obligation and that, in the present case, there was a jury question as to whether the evidence supported a wrongful discharge claim on that theory. The jury ultimately returned a verdict for plaintiff and the trial court entered judgment in accordance with that verdict.

On defendant's appeal, the Court of Appeals reversed. *Lamson v. Crater Lake Motors, Inc.*, 216 Or App 366, 173 P3d 1242 (2007). After considering this court's and its own wrongful discharge cases, the Court of Appeals concluded that the conduct for which plaintiff purportedly had been discharged did not involve interests of sufficient public importance to support a claim that plaintiff was discharged for fulfilling an important societal obligation. *Id.* at 383. The court acknowledged that employers may be held liable in tort for discharging an employee for fulfilling a public duty, and that an employee's "whistleblowing" about activities in the workplace sometimes serves a sufficiently important public interest that discharging the employee for such conduct would be wrongful. The court suggested, however, that that principle would not apply when—as in the present case—the whistleblower's report is internal and does not involve a matter of public health or safety. *Id.* at 380-81. The court also acknowledged that, under its own cases, an important public duty may be served by an employee's refusal to obey an employer's order to engage in unlawful or tortious conduct, and that a discharge in those circumstances could be wrongful. The court concluded, however, that plaintiff's refusal to

participate in the RPM sale did not implicate that principle because, by his own admission, plaintiff had not been ordered by defendant to do anything unethical, unlawful, or tortious. *Id.* at 382. Finally, the court held that, although preventing unlawful trade practices clearly is a matter of general public concern, there is nothing in the record that suggests that plaintiff's *particular* act—refusing to report to work because unlawful trade practices might occur there—enjoys high social value. *Id.* at 382-83.

Before this court, plaintiff contends that, when a plaintiff's wrongful discharge claim alleges that the plaintiff was discharged for fulfilling some important public obligation, the proper focus is on whether Oregon law expresses a general public policy and on whether, in the circumstances of the particular case, that public policy would be thwarted to some degree if the plaintiff's employer could discharge him or her with impunity. Plaintiff argues that the Court of Appeals erred in focusing, instead, on the particular *acts* that triggered plaintiff's dismissal and on whether the laws of this state require such *acts* or specifically identify *them* as having public importance. Plaintiff also argues that the Court of Appeals erred to the extent that it suggested that only public policies pertaining to health and safety are sufficiently weighty to give rise to a claim of wrongful discharge. He asserts that there is no support for that particular distinction (or, indeed, for the entire notion of weighing public policies) in this court's principal wrongful discharge cases—*Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975), *Delaney v. Taco Time Int'l.*, 297 Or 10, 681 P2d 114 (1984), and *Babick v. Oregon Arena Corp.*, 333 Or 401, 40 P3d 1059 (2002).

Plaintiff correctly identifies the cases from this court that are most relevant to his wrongful discharge claim. Reviewing them at this point facilitates our analysis. In *Nees*, this court recognized, for the first time, that, in spite of a general and longstanding rule that private employment continues at the will of the parties and can be terminated by either party at any time and for any reason, there are "circumstances in which an employer discharges an employee for such a socially undesirable motive that the employer must respond in damages for any injury done." 272 Or at 218. The plaintiff in that case was terminated for accepting, over her

employer's objection, a call to jury duty. This court examined various Oregon cases, statutes, and constitutional provisions pertaining to jury duty and the right to trial by jury, and determined that those sources "clearly indicate[d] that the jury system and jury duty are regarded as high on the scale of American institutions and citizen obligations." *Id.* at 219. Having established that point, the court concluded that plaintiff had stated a claim for wrongful discharge because, "[i]f an employer were permitted with impunity to discharge an employee for fulfilling her obligation of jury duty, the jury system would be adversely affected [and t]he will of the community would be thwarted." *Id.*

In *Delaney*, the court further described the "wrongful discharge" action that it first had recognized in *Nees*. It began by explaining the court's various wrongful discharge cases in terms of several categories, only two of which were recognized as a proper basis for a wrongful discharge claim—cases in which the plaintiff was discharged for "fulfilling a *societal* obligation," 297 Or at 15 (emphasis added) and cases in which the plaintiff was discharged for "pursuing a right related to his role as an employee and the right is one of important public interest indicated by constitutional and statutory provisions and caselaw." *Id.* at 16. The court then held that the discharge at issue in that case—a discharge for refusing to sign a false and defamatory statement about another employee's conduct—fell into the first category. That was so, because evidence of a societal obligation to refrain from defaming others could be found in the common law and in two sections of the Oregon Constitution—Article I, section 8, which prohibits the passage of laws restraining free speech and expression but warns that "every person shall be responsible for the abuse of this right," and Article I, section 10, which provides that "every man shall have remedy by due course of law for injury done him in his * * * reputation." *Id.* at 17.

Finally, in *Babick*, this court concluded that the Court of Appeals erred in overturning a trial court's dismissal of wrongful discharge claims brought by security guards whose employer discharged them for arresting customers at a public event for unlawful possession of drugs and alcohol and other criminal conduct. The Court of Appeals had

concluded that the plaintiffs had stated a claim under the "discharge for fulfilling a public duty" branch of the wrongful discharge tree. *Babick v. Oregon Arena Corp.*, 160 Or App 140, 149, 980 P2d 1147 (1999). It perceived evidence, in various statutes, that Oregonians value both a safe and orderly community and reliable and effective law enforcement by citizen officers, and it held that those "policies" would be "thwarted" if the defendant was permitted to discharge its employees with impunity for arresting lawbreakers. *Id.* at 146.

On review, this court stressed that the Court of Appeals was correct in holding that courts reviewing wrongful discharge claims cannot simply create a relevant public duty to suit the occasion, but must actually "find" one in the state's constitutional and statutory provisions and case law. *Babick*, 333 Or at 409. But we also held that the statutes that the Court of Appeals had identified as relevant to the question—general public safety statutes and statutes authorizing and regulating private law enforcement—were "far too general" to support a claim of wrongful discharge on a public duty theory. We observed that "[w]e are concerned here with a duty to perform a specific act (the arrest of lawbreakers by private citizens or private security personnel), and the statutes cited have nothing to say about that kind of act." *Id.* We then concluded that,

> "even accepting the view of the Court of Appeals that a 'public duty' may arise out of some expression of a 'substantial public policy' that would be thwarted by the discharge at issue (as opposed to a law that specifically obligates an employee to act in a certain way), plaintiffs have failed to establish that predicate here."

*Id.* at 410.

■ The foregoing passage from *Babick* clearly speaks to plaintiff's present contentions regarding the proper focus when a "public duty" wrongful discharge claim is under review. Notably, however, the passage does not adopt the formulation that plaintiff contends for (*i.e.*, that a "public duty" wrongful discharge claim exists when some general public policy expressed in statute, constitution, or case law would be "thwarted" by the discharge at issue). Rather, it holds that,

*even if* a "public duty" wrongful discharge claim theoretically could arise in the absence of a law imposing a specific legal obligation to perform the act or acts that trigger the discharge, the sources of law that express the asserted "public policy" must in *some* sense speak directly to those acts. And because, in *Babick*, the statutes that the plaintiffs identified had nothing to say about the law enforcement activities that triggered the plaintiffs' discharge in that case, this court could not accept the plaintiffs' contention that those plaintiffs were wrongfully discharged for acting in accordance with a public duty. *Id.*

■     With those principles in mind, we turn to the issue in controversy. We begin by examining the legal sources that plaintiff identifies as pertinent to determine if they reflect a public policy that is relevant to plaintiff's claim. Plaintiff relies primarily on the Oregon statute that identifies unlawful business and trade practices, ORS 646.608, and on certain of the accompanying regulations, OAR 137-020-0020 and OAR 137-020-0050. He argues that those sources reflect a strong public interest in preventing the kinds of sales tactics that purportedly were used during the RPM sales event.

We do not disagree with that proposition, as far as it goes. ORS 646.608 expressly defines as unlawful trade practices, *inter alia*, making false and misleading representations about the sources of goods for sale, any price reductions on those goods, or the nature of the obligations that will be incurred in a sales transaction. OAR 137-020-0020(3)(m), also cited by plaintiff, specifically defines as unfair and deceptive the practice of "packing" car payments with charges for additional services that are not disclosed to the buyer. And OAR 136-020-0050(2)(g)(C) classifies as deceptive conduct the practice of headlining an advertisement with an offer that only applies to a few of the vehicles covered by the advertisement. In short, we agree with plaintiff that the laws of Oregon reflect a public policy that generally prohibits and seeks to prevent the kinds of deceptive conduct that plaintiff reasonably believes had occurred at the first RPM sales event, and could occur again.

But how does that point relate to plaintiff's specific theories of wrongful discharge? Plaintiff first contends that

he was wrongfully discharged for refusing to engage in unlawful and unethical practices. The public policy we have discussed might be thwarted by such a discharge, and, if the evidence presented at trial supported plaintiff's claim that he was fired for refusing a directive to violate state law, a wrongful discharge claim might lie. But the evidence does *not* support plaintiff's contention. In fact, plaintiff acknowledged in his own testimony that his superiors never asked him to do anything unlawful or unethical.

Plaintiff also alleged that he was wrongfully discharged for *complaining to management* about what he reasonably believed to be RPM's illegal and unethical sales tactics. Inherent in that claim is the notion that defendant's proffered reason for terminating plaintiff—that plaintiff skipped four days of work—was pretextual. Plaintiff suggests that the Court of Appeals ignored evidence that would support a conclusion that the proffered reason was a pretext and rejected his claim on that ground. Plaintiff's suggestion is incorrect. In fact, the Court of Appeals assumed that the evidence was sufficient to support plaintiff's' theory about the real reason for his termination, but concluded that plaintiff's claim still fell short, because he had failed to establish that his internal complaints fulfilled an important public duty or served an important public interest. *Lamson*, 216 Or App at 380. And, we also assume that the jury was entitled to conclude that the defendant's stated excuse for plaintiff's dismissal was pretextual.

Having accepted plaintiff's version of the pivotal facts, we are left to determine whether plaintiff's internal complaints to Crater Lake management about RPM's unlawful and unethical sales practices served a public duty or interest that is sufficiently important to warrant a departure from the ordinary rules of law respecting discharge from at-will employment.

As we have already stated, the laws of Oregon impose a duty on all persons not to engage in unlawful trade practices. As we recognized in *Delaney*, an employer that discharges an employee for refusing to engage in practices that the UTPA prohibits violates that public policy, and we would have no difficulty recognizing a wrongful discharge action

under those circumstances. It also is arguable that an employer that discharges an employee for reporting to management that employees were being required by their supervisors to engage in such unlawful practices also would violate that public policy. In both situations the employee would, at least arguably, be fulfilling his or her own duty not to engage in deceptive practices. For the sake of argument, the same could be true if, by virtue of his or her position in the corporation, the employee was responsible for ensuring that the corporation's acts were lawful and ethical and, in an exercise of that responsibility, reported to management that the corporation itself was engaging in unlawful practices. However, we need not decide any of those issues in this case, because none of the foregoing hypotheticals occurred here.

In this case, defendant did not report to defendant's management that he had been required to engage in unlawful trade practices or, in the exercise of his job responsibilities, that defendant corporation was itself engaged in such practices. Instead, plaintiff reported to defendant's management that an outside sales firm with which defendant had contracted—RPM—had engaged in unlawful practices and that plaintiff did not think defendant corporation should be associated with an outside firm of that ilk. Certainly, that was a defensible point of view, but, in light of the scope of authority that RPM had over the sales event, it was misdirected. At that juncture, the Attorney General and the various district attorneys were the ones who had authority to act immediately. *See* ORS 646.632(1) (authorizing enforcement action by "prosecuting attorney"); ORS 646.605(5) (defining "prosecuting attorney" to include Attorney General, district attorney).

There are instances in which employees may be protected when they report unlawful actions of others by means of civil or criminal channels recognized by law, *see, e.g.*, ORS 659A.230(1) (prohibiting employers from discriminating against employee for reporting criminal activity, cooperating with criminal investigation, and providing remedies), but again, that is not what happened in this case. Plaintiff did not report the unlawful trade practices of RPM to any entity with authority to take action to enforce the UTPA against RPM.

Plaintiff has proceeded in this wrongful discharge action on two theories: first, that he was terminated for refusing to engage in unlawful practices, and, second, that he was terminated for complaining to upper management about RPM's sales tactics. The evidence would not permit a jury to find in accordance with the first of those allegations but would permit a jury to find in accordance with the second. However, with respect to that second allegation, for the reasons discussed, we cannot find that plaintiff's actions fulfilled the kind of duty that is protected by actions for wrongful discharge.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.