Argued and submitted September 15, 2009, general judgment on claims for
retaliation under ORS 659A.203 and for common-law wrongful discharge
reversed and remanded, otherwise affirmed; supplemental judgment
reversed May 5, 2010

Duane HUBER,
*Plaintiff-Appellant,*

*v.*

OREGON DEPARTMENT OF EDUCATION,
an Oregon state administrative agency;
Mark E. Hunt, an individual;
Helen Ashley, an individual;
Jane Mulholland, an individual;
and Don Ouimet, an individual,
*Defendants-Respondents.*

Marion County Circuit Court
05C11924; A136940

230 P3d 937

David H. Griggs argued the cause for appellant. With him on the briefs was Dolan Griggs LLP.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondents. With her on the brief were John R. Kroger, Attorney General, and Rolf C. Moan, Acting Solicitor General.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

ROSENBLUM, J.

## ROSENBLUM, J.

Plaintiff appeals a general judgment resolving plaintiff's four claims concerning employment discrimination in favor of defendants, and a supplemental judgment awarding costs to defendants. On appeal, plaintiff contends that the trial court erred in granting defendants' summary judgment motion concerning (1) his claim pursuant to 42 USC section 1983 for violation of plaintiff's First Amendment rights; (2) his claim for retaliation pursuant to ORS 659A.230 for initiating a civil proceeding; (3) his claim pursuant to ORS 659A.203 for "whistleblowing"—that is, for disclosing information regarding, among other things, violations of state and federal law; and (4) his claim for a common-law wrongful discharge. For reasons that we will explain, the trial court erred in granting defendants summary judgment as to plaintiff's "whistleblowing" claim pursuant to ORS 659A.203 and his common-law wrongful discharge claim. Accordingly, we reverse and remand as to those claims.

We state the facts in the light most favorable to plaintiff, drawing all reasonable inferences in his favor. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). Accordingly, where the record could reasonably support either party's version of events, we state the facts as described by plaintiff. Based on that standard, the record establishes the following relevant facts.

Plaintiff was employed as a licensed practical nurse at the Oregon School for the Blind. He was supervised by Helen Ashley, a registered nurse. A number of disputes arose between Ashley and plaintiff. A detailed recounting of all of those disputes would be of no benefit to the bench, bar, or public.[1] Accordingly, we recount the details of only those disputes that are relevant to the issues raised on appeal.

One of plaintiff's duties was to administer medications to students. In September 2003, plaintiff and Ashley had a disagreement concerning medication directions that plaintiff received from Ashley. Plaintiff had been told by a student's parent that the prescribing doctor for that student

---

[1] We reject without discussion plaintiff's assertion that he engaged in protected activities in the course of the other disputes between Ashley and himself.

had reduced the dosage of a particular medication and that the instructions on the bottle of the medication did not reflect the new dosage. Plaintiff told Ashley that they needed to contact the student's doctor to determine the proper dosage. The student's doctor's office was contacted, but, when the doctor had not called back on the following day, Ashley decided that the appropriate action was to follow the instructions on the bottle. Plaintiff disagreed. Ashley instructed a different nurse to administer the medication to the student using the instructions on the bottle.

Plaintiff then contacted a representative of the Oregon State Board of Nursing (OSBN) to discuss the proper response to a situation where a parent informs a nurse that the written instructions on a bottle of medication are not current. An OSBN representative told him that it would be negligent for a nurse to dispense a medication according to the label without confirming the proper dosage from the doctor in such an instance. He noted that advice in the nurses' communication book, which is used by school staff to communicate about student medical care. A different note in the nurses' communication book states that the "State [Board] of Nursing phoned with a message for [plaintiff] regarding medication. [Ashley] is correct."

On September 8, Ashley spoke to plaintiff about his contact with the OSBN. During that conversation, Ashley indicated that she was angry at plaintiff for contacting the OSBN without her permission and told plaintiff that he had questioned her authority. On November 13, plaintiff received a letter of expectation from Ashley that explicitly forbade him from communicating about student medical issues with anyone outside of the school's student health services without first obtaining written authorization.

After that incident, plaintiff noticed that Ashley began treating him differently; he believed that she was treating him differently in retaliation for reporting their disagreement to the OSBN. He described incidents in which Ashley (1) gave him work assignments that isolated him from the students and other staff; (2) wrote a false note in a student's chart that made him appear negligent for failing to address a student's known medical issue; and (3) made false

statements to plaintiff's coworkers about his work performance.

Other disputes about medical treatment issues arose between plaintiff and Ashley, which culminated in Ashley giving him a written reprimand for insubordination on January 19, 2004. In addition to other issues, the reprimand noted that plaintiff had received a letter of expectation instructing him to contact only Ashley with any questions about any student's medical treatment.

Plaintiff requested a human resources investigation of Ashley for harassment and retaliation against him for questioning her orders and contacting the OSBN. On February 18, plaintiff filed a grievance directed at the letter of reprimand, in which plaintiff wrote that the letter of reprimand was "part of a pattern of punitive and retaliatory behavior by [Ashley]." Hunt, the director of employee services for the Oregon Department of Education, investigated the grievance. Hunt's investigation revealed what he characterized as "questionable" management practices by Ashley.

On March 1, plaintiff informed Mulholland, the Oregon Department of Education's director of special schools, that he intended to file a complaint with the OSBN relating to the false note that Ashley wrote in a student's chart that made his treatment of a student appear negligent.

A few days later, plaintiff discovered a clipboard containing students' names and private medical information hanging in an area of the school to which visitors and other nonmedical personnel had access. He learned that Ashley had ordered that the clipboard be placed in that area. He believed that the placement of the clipboard violated the privacy provisions of the Health Insurance Portability and Accountability Act (HIPAA). He filed a complaint with the federal Department of Health & Human Services (DHHS). He also complained about the placement of the clipboard to Ouimet, Ashley's supervisor.

Plaintiff met with Ouimet on March 15 to discuss the clipboard and student privacy issues. He informed Ouimet about the complaint to the DHHS. Ouimet told plaintiff to contact him before making any complaints to any

entities outside of the school. Hunt described plaintiff's decision to complain to the DHHS as "disconcerting." After the March 15 meeting, plaintiff had additional disputes with Ashley about medical treatment issues. He informed Ouimet that he intended to file a "detailed complaint with the OSBN about perceived substandard nursing care at [the school]."

Plaintiff met with Ouimet, Hunt, and Mulholland on March 29 to discuss Ashley's alleged retaliation against him and his belief that she was engaging in substandard nursing practices. At that meeting, plaintiff was instructed to follow Ashley's instructions without question and ordered not to contact outside entities without first notifying Ouimet. Plaintiff responded by citing specific Oregon Administrative Rules that govern licensed practical nurses and registered nurses. He told Ouimet, Hunt, and Mulholland that those nursing regulations required that he question any order that he believed to be unsafe or contraindicated for the patient. Hunt told him that those rules did not apply at the school, that employees were expected to follow the orders of their supervisors unless the orders put the employees in danger, and that the appropriate response to a disagreement with Ashley would be to "work now, grieve later." Plaintiff complained that he was the only nurse being given that restriction and that that restriction could put a student's health in danger and put him at risk of losing his nursing license. Defendants told plaintiff that his refusal to obey the restriction on contacting outside entities was insubordinate, and he was placed on administrative leave.

In April 2004, plaintiff received a notice of initiation of predismissal procedures. Mulholland and Ouimet recommended that plaintiff be terminated as insubordinate, and Hunt decided to terminate him on that ground. The predismissal notice asserted that plaintiff had stated, during the March 29 meeting, that he would be insubordinate. Plaintiff submitted a written response, in which he denied saying that he would be insubordinate and wrote that his "troubles with [Ashley] began * * * when [he] contacted the State Board of Nursing" about the dispute over prescription dosing instructions. He further explained that he "value[d] [his] nursing license too much to blindly follow poor nursing instruction

when [he] knew it can put the student's health and even their life in jeopardy."

Ultimately, plaintiff received a dismissal letter indicating that he was being terminated for insubordination. He then resigned in lieu of termination. The letter included—as one of the "facts supporting this action"—the allegation that he "had stated there are times when [plaintiff] would choose to be insubordinate and not follow [Ashley's] direction for medical care of students if [he] felt [he] made the right decision by performing other care." The letter continued by explaining that plaintiff's statement that, "if [he] thought the medical direction [his] supervisor gave [him] was not in agreement with what [he] believed to be correct, [he] would not do as directed[ ]" caused the school to "not be able to trust [that he] will provide the medical care directed by the nurse supervisor." The letter referred to the prescription-dosing dispute between Ashley and plaintiff and to defendants' requirement that he obtain permission from Ashley before contacting outside entities with medical treatment issues. It also referred to Ouimet's instruction that he should attempt to resolve all medical treatment issues internally.

A series of e-mail communications between Ouimet, Hunt, Mulholland, and Ashley—which occurred shortly after plaintiff's resignation—indicate that one of their "concerns" with plaintiff was that he should have been "trying to resolve problems rather than just report them." That is, defendants were concerned that he had reported what he believed to be a HIPAA violation to the DHHS instead of trying to resolve the issue internally. Hunt wrote that plaintiff's statement that he was not obligated to "try to fix a concern that he had before making his complaint" led "to the action taken."

Plaintiff subsequently initiated the underlying action, raising the four claims previously described. In general, plaintiff alleges that defendants' decision to terminate him for filing a complaint with the DHHS concerning a purported HIPAA violation and threatening to complain to the OSBN about substandard nursing practices at the school during his discussions with Ouimet in March (1) violated his free speech right under the First Amendment because he had spoken as a citizen on a matter of public concern; (2) was an

unlawful employment practice under ORS 659A.230 because the decision was retaliation for plaintiff's initiation of a civil action that was adverse to his employer; (3) was an unlawful employment practice under ORS 659A.203 because the decision was retaliation for plaintiff's objectively reasonable "whistleblowing"; and (4) was an actionable wrongful discharge under the common law because he had been discharged for fulfilling an important public duty.

Defendants moved for summary judgment on all of plaintiff's claims. The trial court granted the motion after concluding that plaintiff did not engage in any protected activities and that defendants' decision to terminate plaintiff's employment was motivated solely by his insubordination. Plaintiff appeals.

On appeal, plaintiff challenges the trial court's grant of summary judgment on each of his four claims and renews the contentions that he made before the trial court.

In reviewing the trial court's decision to grant defendants' motion for summary judgment, we view the record in the light most favorable to plaintiff to determine whether defendants met their burden of demonstrating that no genuine issues of material fact exist and that they were entitled to judgment as a matter of law. *Jones*, 325 Or at 420. No genuine issues of material fact exist if "no objectively reasonable juror could return a verdict for the adverse party on the matter[.]" ORCP 47 C.

Because plaintiff's contentions concerning his section 1983 claim for violation of his First Amendment rights and his retaliation claim under ORS 659A.230 for initiating a civil proceeding require little discussion, we address and dispose of them first. The First Amendment protects a public employee's free speech rights when the speech is made as a private citizen on a matter of public concern. *Garcetti v. Ceballos*, 547 US 410, 415-16, 126 S Ct 1954, 164 L Ed 2d 689 (2006). Accordingly, as defendant argues, for plaintiff to prevail, he must have spoken "as a citizen." *See id.* (so stating). In this case, plaintiff's complaint to the DHHS and threat to complain to the OSBN were not made as a private citizen. *See, e.g., Davis v. Cook County*, 534 F3d 650, 653-54 (7th Cir

2007) (concluding that, where a nurse criticized the team-
work and professionalism of her colleagues, she spoke pur-
suant to her job duties as a public employee and her speech
was not constitutionally protected). Thus, like the plaintiff in
*Davis*, plaintiff's speech was not constitutionally protected by
the First Amendment as a matter of law. Accordingly, the
trial court did not err in granting summary judgment for
defendants as to that claim.

■ We reach the same conclusion with respect to plain-
tiff's claim under ORS 659A.230 for the initiation of a civil
proceeding.[2] The critical flaw in plaintiff's position is that his
complaint to the DHHS and threat to complain to the OSBN
were administrative matters—not criminal or civil actions—
and were therefore not protected by ORS 659A.230. *See
Mantia v. Hanson*, 190 Or App 36, 41 n 3, 77 P3d 1143 (2003)
(concluding that, because the relevant statute protected only
criminal or civil complaints, a plaintiff's complaint about
"allegedly unsafe work conditions and threat[ ] to complain to
Oregon occupational safety authorities about those condi-
tions" was not protected by that statute). Thus, plaintiff's
claim fails as a matter of law, and the trial court did not err in
granting summary judgment as to that claim.

■ We next turn to plaintiff's claim pursuant to ORS
659A.203 for "whistleblowing"—that is, for disclosing infor-
mation concerning, among other things, violations of state
and federal law. That statute provides, in part:

"(1)   * * * [I]t is an unlawful employment practice for
any public employer to:

"* * * * *

---

[2] ORS 659A.230(1) provides:

"It is an unlawful employment practice for an employer to discharge,
demote, suspend or in any manner discriminate against or retaliate against an
employee with regard to promotion, compensation or other terms, conditions or
privileges of employment for the reason that the employee has in good faith
reported criminal activity by any person, has in good faith caused a complain-
ant's information or complaint to be filed against any person, has in good faith
cooperated with any law enforcement agency conducting a criminal investiga-
tion, has in good faith brought a civil proceeding against an employer or has
testified in good faith at a civil proceeding or criminal trial."

"(b)   Prohibit any employee, or take or threaten to take any disciplinary action against an employee for the disclosure of any information that the employee reasonably believes is evidence of:

"(A)   A violation of any federal or state law, rule or regulation by the state, agency or political subdivision[.]

"* * * * *

"(c)   Require any employee to give notice prior to making any disclosure or engaging in discussion described in this section * * *.

"(d)   Discourage, restrain, dissuade, coerce, prevent or otherwise interfere with disclosure or discussions described in this section.

"(2)   No public employer shall invoke or impose any disciplinary action against an employee for employee activity described in subsection (1) of this section * * *."

Plaintiff contends that he reasonably believed that defendants had violated federal and state law and that his complaint to the DHHS and threat to complain to the OSBN were substantial factors in defendants' decision to terminate his employment in violation of ORS 659A.203. With respect to plaintiff's complaint to the DHHS, there was evidence from which a jury could find that plaintiff reasonably believed that the information that he disclosed to that agency—that is, that a clipboard listing students' names and private medical information was placed in a location to which visitors and nonmedical personnel had access—was evidence of a HIPAA violation.[3] Further, with respect to plaintiff's threat to complain to the OSBN, there was evidence from which a jury could find that plaintiff reasonably believed that substandard nursing practices—including Ashley's role in the prescription dosing dispute—had occurred at the school and that those practices violated OAR 851-045-0010 (Jan 3, 1995) and OAR 851-045-0015 (Jan 3, 1995), the regulations in effect at

---

[3] Apparently, DHHS ultimately determined that the school was not subject to HIPAA; therefore, the placement of the clipboard did not actually violate HIPAA. However, there is evidence that Ashley had told plaintiff that the school *was* subject to HIPAA. Based on that evidence, a jury could find that defendant reasonably believed that his complaint disclosed a HIPAA violation, even if that belief was ultimately incorrect.

that time that governed the appropriate standard of care for registered nurses and required the reporting of substandard practices.

The fact that plaintiff never actually complained to the OSBN about substandard nursing practices is of no consequence. Under ORS 659A.203, a public employer engages in unlawful employment practices when, in response to an employee's threat to complain about violations of law, the employer discourages the complaint and requires the employee to give notice before complaining. ORS 659A.203(1)(c), (d). Moreover, the employer engages in an unlawful employment practice under ORS 659A.203(1)(b) if it characterizes the employee's resistance to the employer's violations of ORS 659A.203(1)(c) and (d) as "insubordination" and subsequently disciplines the employee for that "insubordination."[4] Thus, there is evidence from which a jury could find that plaintiff reasonably believed that Ashley's nursing practices were substandard and in violation of state law, even though plaintiff never actually complained to the OSBN.

■ As previously indicated, plaintiff also contends that his complaint to the DHHS and threat to complain to the OSBN were substantial factors in defendants' decision to terminate his employment in violation of ORS 659A.203. Whether an employer who discharged an employee was motivated by an impermissible reason is a question of fact. *Demaray v. Dept. of Environmental Quality*, 127 Or App 494, 502, 873 P2d 403, *rev den*, 319 Or 625 (1994). As we recently explained, to prove that an employee was terminated on unlawfully discriminatory grounds,

---

[4] To interpret the statute otherwise would lead to two absurd results. First, an employer could avoid liability by simply terminating an employee before the employee is able to file the complaint. Second, an employer could avoid liability by making an employee rule that forbids any "whistleblowing." In doing so, the employer could avoid liability under this statute by penalizing an employee who violated that rule not because of the employee's "whistleblowing," but because the rule against "whistleblowing" was violated and the employee was *insubordinate* in not complying with the rule. Bluntly, if the employer creates an employment rule that, in and of itself, constitutes an unlawful employment practice, the employer also commits an unlawful employment practice when it decides to dismiss an employee who fails to comply with the unlawful rule.

"[i]t is sufficient in Oregon for the plaintiff to show that unlawful motive was a substantial and impermissible factor in the discharge decision. We have previously noted that a plaintiff's *prima facie* burden in an employment discrimination case is so minimal that it is virtually impervious to a motion based on evidentiary sufficiency."

*Herbert v. Altimeter, Inc.*, 230 Or App 715, 722, 218 P3d 542 (2009) (internal citations and quotation marks omitted; brackets in original). In *Henderson v. Jantzen, Inc.*, 79 Or App 654, 658, 719 P2d 1322, *rev den*, 302 Or 35 (1986), we explained that "[a] plaintiff's *prima facie* case does not disappear merely because a defendant asserts a nondiscriminatory reason which may or may not persuade the trier of fact."

Here, although a jury could reasonably find that defendants' decision to terminate plaintiff was based on insubordination, it could also reasonably find that plaintiff's complaint to the DHHS and his threat to complain to the OSBN were substantial factors in defendants' adverse employment decision. The series of e-mail communications between Ouimet, Hunt, Mulholland, and Ashley indicating that plaintiff should have been trying to resolve problems rather than "just report[ing] them" and that plaintiff's statement that he was not obligated to try to fix problems before reporting them led to defendants' decision to dismiss plaintiff supports an inference that plaintiff was terminated because of his complaint to the DHHS and threatened complaint to the OSBN.

The close temporal proximity between defendants' discovery of the complaint to the DHHS and plaintiff's threat to complain to the OSBN further supports that inference. *Cf. Herbert*, 230 Or App at 724 (close temporal proximity of an employee's engagement in protected activity to termination of employment is circumstantial evidence that the employer had an impermissible motive). Plaintiff told Ouimet on March 15, 2004, that he had filed the complaint with the DHHS and that he intended to file a complaint with the OSBN about what he believed to be substandard nursing practices. Those disclosures were followed by another meeting on March 29, at the conclusion of which plaintiff was placed on administrative leave for refusing to obey the

restriction on complaining to outside entities. Predismissal procedures were initiated shortly thereafter. A jury could reasonably infer from the timing of those events that defendants decided to terminate plaintiff because of his complaint and threat to complain further.

In sum, because there is evidence from which a reasonable jury could find that plaintiff reasonably believed that defendants had violated federal and state law and evidence from which a jury could find that his complaint to the DHHS and threat to complain to the OSBN concerning those violations were substantial factors in defendants' decision to terminate plaintiff's employment in violation of ORS 659A.203, genuine issues of material fact exist. Accordingly, the trial court erred in granting defendants summary judgment as to plaintiff's retaliation claim pursuant to ORS 659A.203.

■■ Finally, we turn to plaintiff's common-law wrongful discharge claim. The discharge of an employee is actionable where the employee is discharged for fulfilling an "important public duty." *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002). Whether an "important public duty exists" is a question of law. Thus, the question is whether complaining to the DHHS about a perceived HIPAA violation and threatening to complain to the OSBN about substandard nursing practices fulfilled important public duties.

"This court cannot create a public duty but must find one in constitutional or statutory provisions or case law." *Eusterman v. Northwest Permanente, P.C.*, 204 Or App 224, 229-30, 19 P3d 213, *rev den*, 341 Or 579 (2006). "To establish a duty, statutes cannot merely express a general public policy; rather, they must encourage specific acts or 'otherwise demonstrat[e] that such acts enjoy high social value.'" *Id.* at 230 (quoting *Babick*, 333 Or at 409; brackets in original). A plaintiff can demonstrate that an important public duty exists through statutes or rules that "specifically encourage or require a particular action." *Love v. Polk County Fire District*, 209 Or App 474, 486, 149 P3d 199 (2006).

■ In the absence of a mandatory reporting requirement, an employee can demonstrate that an important public duty exists by citing statutes or other authority indicating

legislative policies to promote the reporting of violations and prevent employers from retaliating against employees who report such violations. *See McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or App 107, 110, 648 P2d 21, *rev den*, 298 Or 37 (1984) (concluding that an employee who was terminated after threatening to report what she believed to be patient abuse had fulfilled an important public duty, where various statutes indicated a legislative desire to protect patients from abuse and good faith reports of patient abuse were statutorily protected from retaliation). Specifically, the Supreme Court recently explained that, for purposes of a common-law wrongful discharge claim, an important public duty could theoretically arise "in the absence of a specific legal obligation to perform the act or acts that trigger the discharge, [but] the sources of law that express the asserted 'public policy' must in *some* sense speak directly to those acts." *Lamson v. Crater Lake Motors*, 346 Or 628, 637-38, 216 P3d 852 (2009) (emphasis in original).

At the time that plaintiff threatened to complain to the OSBN, OAR 851-045-0005(3)(b) (Jan 3, 1995) provided that a "licensed practical nurse has the authority and responsibility to question any order which is not clear, perceived as unsafe, contraindicated for the client, or not within the health care professional's scope of practice[.]" Further, OAR 851-045-0020(3) (Jan 3, 1995) provided that

> "[a]nyone knowing of a licensed nurse whose behavior or nursing practice fails to meet accepted standards * * * shall report the nurse to the person in the work setting who has authority to institute corrective action. Anyone who has knowledge or concern that the nurse's behavior or practice presents a potential for, or actual danger to the public health, safety, and welfare, shall report or cause a report to be made to the [OSBN]. Failure of any licensed nurse to comply with this reporting requirement may in itself constitute a violation of nursing standards."

Those OSBN regulations demonstrate a policy to ensure patient safety by establishing a standard of care that required nurses to question unsafe orders and report concerns about potentially dangerous and substandard nursing practices to the OSBN. That policy is thwarted if an employer punishes a nurse who fulfills his or her duty to report to the

OSBN any nursing practice that he or she believes presents a potential danger to the public health, safety, and welfare. We therefore conclude that the reporting of potentially dangerous substandard nursing practices to the OSBN is an important public duty.[5] Further, there is evidence in the record from which a jury could find that the nursing practices that plaintiff threatened to report were potentially dangerous enough to trigger the requirement that the nurse report the issue directly to the OSBN instead of merely reporting it to a supervisor. Thus, a jury could find that plaintiff engaged in conduct protected by the common-law doctrine of wrongful discharge by threatening to report substandard nursing practices to the OSBN.

For those reasons, the trial court erred in concluding that there was no important public duty that required plaintiff to complain to the OSBN about substandard nursing practices. Moreover, there was evidence from which a jury could find that plaintiff engaged in protected activities and that his engagement in those activities was a substantial factor in defendants' decision to terminate him. Accordingly, the trial court erred in granting summary judgment as to the common-law wrongful discharge claim. Given our disposition regarding plaintiff's threat to complain to the OSBN, we do not need to reach his argument concerning his complaint to the DHHS.

In summary, genuine issues of material fact precluded that trial court's grant of summary judgment as to plaintiff's "whistleblowing" claim under ORS 659A.203 and as to plaintiff's common-law wrongful discharge claim. Accordingly, we reverse on plaintiff's claims for "whistleblowing" under ORS 659A.203 and for common-law wrongful discharge and remand those claims to the trial court, but affirm the trial court's grant of summary judgment as to the remaining claims. In light of our disposition, we must also reverse the supplemental judgment for costs. *See* ORS 20.220(3)(a)

---

[5] Again, defendants decided to terminate plaintiff before he actually followed through with his intent to file a complaint with the OSBN. The fact that he was terminated before filing a complaint does not affect our conclusion. "There is no reason that an employee's protection should depend on whether the employer acts before or after the employee is able to file a complaint." *McQuary*, 69 Or App at 111 n 5.

(providing that, when this court reverses a judgment to which an award of costs relates, the award of costs "shall be deemed reversed").

General judgment on claims for retaliation under ORS 659A.203 and for common-law wrongful discharge reversed and remanded, otherwise affirmed; supplemental judgment reversed.