Argued and submitted June 10, 2014, reversed and remanded as to claims of wrongful discharge, intentional infliction of emotional distress, and conversion; otherwise affirmed June 17; petition for review denied October 22, 2015

(358 Or 145)

Edward F. McMANUS, III,
*Plaintiff-Appellant,*

*v.*

James Lee AUCHINCLOSS,
*Defendant-Respondent.*

Jackson County Circuit Court
102765L9; A152789

353 P3d 17

G. Jefferson Campbell, Jr., argued the cause for appellant. With him on the briefs was G. Jefferson Campbell, Jr., P.C.

Brett A. Baumann argued the cause for respondent. With him on the brief was Frohnmayer, Deatherage, Jamieson, Moore, Armosino & McGovern, P.C.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

EGAN, J.

EGAN, J.

Plaintiff appeals a limited judgment granting summary judgment in favor of defendant, his former employer, on plaintiff's claims of wrongful discharge, intentional infliction of emotional distress (IIED), and conversion. Defendant discharged plaintiff from employment as his personal assistant when plaintiff—after complaining to defendant about defendant's possession and display of child pornography—reported defendant to the police and assisted the police with their investigation. Plaintiff argues that the trial court erred in granting summary judgment on his common-law wrongful discharge claim, because defendant terminated him for fulfilling an important public duty, which is an exception to the at-will employment rule. Defendant responds that that exception does not protect plaintiff, because no statute, rule, or constitutional provision establishes an important public policy that encourages domestic workers to report the crimes of their employers and, consequently, we may not conclude that plaintiff was fulfilling an important public duty when he did so. Plaintiff also argues that the court erred in granting defendant summary judgment on his claims for IIED and conversion. On each of those issues, we agree with plaintiff.[1] Accordingly, we reverse and remand.

On appeal, we will affirm the trial court's grant of summary judgment if we agree that "there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law." *Robinson v. Lamb's Wilsonville Thriftway*, 332 Or 453, 455, 31 P3d 421 (2001). When reviewing a trial court's grant of summary judgment, we view the facts and all reasonable inferences that may be drawn from them in the light most favorable to the nonmoving party—in this case, plaintiff. *Shelter Products v. Steelwood Construction*, 257 Or App 382, 384, 307 P3d 449 (2013).

## I.  BACKGROUND

Defendant hired plaintiff to live and work in his home as a full-time personal assistant in exchange for a

---

[1] We reject without discussion plaintiff's remaining assignments of error—that the trial court erred in denying plaintiff's motion for summary judgment on his claims of defamation, breach of employment contract, and wage and statutory penalty and in failing to recuse itself.

monthly salary and room and board. Plaintiff's job duties included cooking, serving meals, housecleaning, laundry, pet care, yard work, grocery shopping, and organizing defendant's personal affairs—a task that included reviewing defendant's e-mail and sorting "spam" e-mail from more important e-mail.

While reviewing defendant's e-mail, plaintiff opened an e-mail sent to defendant from a man that plaintiff knew to be a recent acquaintance of defendant's. Because the e-mail contained no text and only a single hyperlink to a Russian website, plaintiff clicked the link to determine if the e-mail was spam. The link brought plaintiff to a child-pornography website. Plaintiff informed defendant, who replied that his friends "liked little boys, and so do I."

Plaintiff attests in his affidavit that, in the weeks following the e-mail, he frequently encountered sexual depictions of children in the course of his routine tasks. Plaintiff had regularly served defendant breakfast in bed; however, following the e-mail, plaintiff noticed that, while waiting to be served breakfast, defendant began assembling digital slideshows of nude underage boys engaged in sex acts. When plaintiff served defendant his breakfast, defendant would turn the computer screen toward him and request that he view the images. Defendant also began displaying images of child pornography on a monitor in the living room or on his laptop computer for himself or a small group of friends while plaintiff performed his work duties in the same area of the home. While performing his job duties, plaintiff encountered defendant and a group of men transferring pictures of young boys, which they had just taken at a local 4th of July parade, from a digital camera to a laptop computer while ranking the children as "'hot' or 'not hot.'" During that incident, it was apparent to plaintiff that the men were receiving sexual gratification from the exchange. Plaintiff also encountered a second alarming e-mail, which contained photographs of young, toddler-aged boys recently taken by one of defendant's acquaintances. Some of those photographs were shot in such a way as to peer up the legs of the boys' shorts. Defendant also received packages delivered to the residence that plaintiff discovered contained child pornography. Moreover, plaintiff's affidavit alleges

that he was repeatedly shocked by these images and, on one occasion, he was deeply embarrassed after he and a friend, who was visiting the residence, walked through the living room where defendant was viewing a "highly disturbing" slideshow containing images of nude boys set to patriotic music.

Before the employment relationship at issue began, defendant was aware that plaintiff was the victim of childhood sexual abuse. In the weeks following the initial e-mail, plaintiff told defendant that defendant's collection and display of child pornography in the home was particularly upsetting to him because of his childhood trauma, and that he had begun to experience flashbacks to those events. Additionally, plaintiff told defendant that he was alarmed by the fact that the internet account used by defendant was in plaintiff's name and he feared that he might become caught up in defendant's criminal activities. Defendant responded by explaining that the images he possessed were artistic and beautiful and that the children depicted were having fun and making money. When plaintiff's complaints and requests that defendant stop his activities became more strident, defendant responded that plaintiff was his employee and, as such, defendant was "HWMBO"—a term he coined and began to use frequently to assert his authority that meant "he who must be obeyed."

Several weeks after first encountering the e-mail that contained a link to a child-pornography website, plaintiff gathered all of the child pornography he could find in defendant's home and took it to his attorney. Plaintiff's attorney sent an e-mail to defendant demanding that defendant stop sending and receiving child pornography at his residence and threatening to report those activities to the police if defendant persisted. Defendant continued to send and receive child pornography at the residence, and plaintiff reported defendant's activities to the police. Some weeks later, while defendant was out of state on vacation, police executed a search warrant at defendant's home. Plaintiff assisted the police in the execution of the warrant and later testified to the grand jury that indicted defendant on criminal charges. When defendant returned to Oregon, police arrested him at the airport.

Following his arrest, defendant learned that plaintiff had assisted the police. Consequently, defendant discharged plaintiff and physically moved him out of the residence. Defendant hired new personal assistants, who prevented plaintiff from retrieving several possessions from the residence when he returned to do so, stating that defendant had barred plaintiff from the property. Plaintiff's attorney sent a letter to defendant demanding the return of plaintiff's possessions, but defendant did not return them. Defendant ultimately pleaded guilty and was convicted of encouraging child sexual abuse in the first degree, ORS 163.684.

## II. ANALYSIS

### A. *Common-law wrongful discharge*

As indicated, the trial court granted summary judgment in favor of defendant on plaintiff's claim for common-law wrongful discharge. The trial court concluded that plaintiff could not prevail under the public-duty exception to at-will employment because he could not prove one element of his common-law wrongful discharge claim, namely the public duty element. The court reached that conclusion based on the statutory definition of employee in ORS 659A.001(3)[2] because it excludes domestic service workers.

On appeal, plaintiff does not dispute that he worked in the domestic service of defendant. Instead, he argues that that statutory definition does not apply to his wrongful discharge claim because he brought his claim under the important-public-duty exception, not the private-employee-whistleblower statute.[3] Defendant responds that, even if the statutory definition of "employee" contained in ORS 659A.001(3) does not apply to plaintiff's claim, no source of public policy demonstrates the existence of an important public duty for a domestic service worker to report to the police an employer's possession and display of child pornography. We conclude that the legislature has expressed an

---

[2] ORS 659A.001(3) is quoted below, 271 Or App at 774 n 6.

[3] Plaintiff also argues on appeal that his actions are protected by the job-related-right exception to at-will employment. Because we agree with plaintiff that his actions are protected under the public-duty exception, we do not reach his argument under the job-related-right exception.

important public duty for all employees, including domestic service workers, to report their good-faith belief that their employers have committed crimes involving child abuse.[4] Consequently, we agree with plaintiff that the trial court erred when it granted defendant's summary judgment motion on plaintiff's claim of wrongful discharge.

In *Babick v. Oregon Arena Corp.*, 333 Or 401, 407, 40 P3d 1059 (2002), the Oregon Supreme Court summarized the applicable general principles for establishing a claim for wrongful discharge from at-will employment.

> "Although this court repeatedly has affirmed the general validity of the at-will employment rule, it has acknowledged that a discharge of an at-will employee nonetheless may be deemed 'wrongful' (and, therefore, actionable) under certain circumstances. Examples of such circumstances include: (1) when the discharge is for exercising a job-related right that reflects an important public policy, *see, e.g., Brown v. Transcon Lines*, 284 Or 597, 588 P2d 1087 (1978) (employee unlawfully discharged for filing workers' compensation claim); or (2) when the discharge is for fulfilling some important public duty, *see, e.g., Delaney v. Taco Time Int'l*, 297 Or 10, 681 P2d 114 (1984) (employee discharged for refusing to defame another employee); *Nees v. Hocks*, 272 Or 210, 536 P2d 512 (1975) (employee discharged for serving on jury)."

If a party brings a common-law wrongful discharge claim under the important-public-duty exception to at-will employment, "it is necessary to find a public duty, not create one, using constitutional and statutory provisions, or the case law of this or other jurisdictions." *Id.* at 409 (citing with approval *Babick v. Oregon Arena Corp.*, 160 Or App 140, 144, 980 P2d 1147 (1999), *aff'd in part, rev'd in part*, 333 Or 401, 40 P3d 1059 (2002) (internal quotation marks omitted)). When identifying an important public duty, "we review statutes and other authorities for evidence of a substantial public policy that would *** be 'thwarted' if an employer were allowed to discharge its employee without liability." *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or App 371, 380, 879 P2d 1288 (1994), *rev dismissed*, 321 Or 511

---

[4] Possession of child pornography is a crime that involves child abuse. *See* ORS 163.684.

(1995) (quoting *Nees*, 272 Or at 219). The source of public policy relied on cannot merely express a general public policy; rather, it must "encourage specific acts or otherwise demonstrate that such acts enjoy high social value." *Love v. Polk County Fire District*, 209 Or App 474, 483, 149 P3d 199 (2006) (internal quotation marks and brackets omitted). Indeed, "[t]he sources of law that express * * * 'public policy' must in *some* sense speak directly to [employees'] acts." *Lamson v. Crater Lake Motors, Inc.*, 346 Or 628, 638, 216 P3d 852 (2009) (emphasis in original).

Statutes or other authority indicating a public policy to promote the reporting of employer wrongdoing may support a common-law claim of wrongful discharge under the important-public-duty exception. *Huber v. Dept. of Education*, 235 Or App 230, 242-43, 230 P3d 937 (2010) (concluding that a rule, which states that anyone with a concern that a licensed nurse is engaged in substandard practice shall report that concern, is a regulatory source of the important public duty to report such conduct). Even in the absence of a requirement to report, a statute that otherwise encourages reporting may also support a common-law claim for wrongful discharge. *Love*, 209 Or App at 492 (concluding that ORS 659A.203(1), which prohibits disciplinary action against certain public employee whistleblowers, is a statutory source of the important public duty to report government wrongdoing); *Koller v. Schmaing*, 254 Or App 115, 137, 296 P3d 529 (2012) (concluding that ORS 676.170, which grants civil immunity to a person who supplies a good faith report to a health professional regulatory board, is a statutory source of the important public duty to report health professionals' wrongdoing).

Although courts define a common-law cause of action, such as the important-public-duty exception, the definitions of those exceptions are "intertwined with the legislative expression of policy choices in statutes." *Love*, 209 Or App at 492. Given that, the resolution of the parties' arguments here implicates the relationship between the expression of public policy in statutes and the common law. Our discussion in *Love* provides helpful context for that relationship.

The plaintiff in *Love* was an at-will employee of the Polk County Fire District, a public entity responsible for overseeing fire services in the county. *Id.* at 476-77. Following a fatal accident during a training exercise, the fire district conducted an internal investigation and the National Institute for Occupational Safety and Health (NIOSH) began a separate investigation. *Id.* at 478. As part of the NIOSH investigation, the district assigned the plaintiff to gather training records and other information. When she sought to collect the district's standard operating procedures from the district's fire marshal, the marshal made statements that led the plaintiff to believe that he was backdating documents to cover up the district's shortcomings. *Id.* at 479. The plaintiff reported those observations to coworkers. *Id.* at 480. As a consequence, the district terminated the plaintiff. The plaintiff then brought a common-law wrongful discharge claim against the district alleging that she was discharged as a consequence of the actions that she took to fulfill an important public duty. The trial court granted the district's motion for summary judgment.

We reversed. *Id.* at 494. We explained that a statute protecting an employee from discipline resulting from allegations of employer wrongdoing is a source of public policy that may establish an important public duty, and, if an employee is discharged for fulfilling that duty, then she may be within the protection of the important-public-duty exception. *Id.* at 491-92. We looked to the public-employee-whistleblower statute, ORS 659A.203, which protects public employees from discipline for certain reports of wrongdoing, for the legislature's expression of public policy. *Id.*

Although the plaintiff did not bring her claim under the whistleblower statute, we nonetheless shaped the contours of the common-law exception based on the policy expressed in the statute. *Id.* Specifically, we agreed with the district's argument that evidence of the plaintiff's good-faith belief that the district had engaged in wrongdoing was not enough for the plaintiff's claim to survive summary judgment. We reasoned that because the public-employee-whistleblower statute requires an objectively reasonable belief—not merely a good-faith belief—the public policy in Oregon and,

consequently, a common-law cause of action prem-ised on the important-public-duty exception, also requires an objectively reasonable belief. *Id.* at 492. Ultimately, we held that a genuine issue of material fact existed regarding whether the plaintiff's belief that the marshal was back-dating documents to cover-up district shortcomings was objectively reasonable. *Id.* at 495.

In this case, plaintiff argues that the public policy of Oregon encourages his good-faith report of defendant's possession and display of child pornography and, consequently, that plaintiff's actions fulfilled an important public duty protected by the common-law public-duty exception to at-will employment. Plaintiff identifies the private-employee-whistleblower statute, ORS 659A.230,[5] as the legislative expression of that public policy, and the legislative history of that statute as evidence that that public duty is incumbent upon all private employees, including domestic service workers. Defendant responds that ORS 659A.230 is subject to the definition of "employee" found in ORS 659A.001(1),[6] which excludes domestic service workers, and we should not consider the legislative history cited by plaintiff because that text is clear. Thus, according to defendant, neither ORS 659A.230 nor any other source of law demonstrates the existence of a public policy to encourage private domestic workers to report employer wrongdoing.

---

[5] ORS 659A.230 provides:

"(1) It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported criminal activity by any person, has in good faith caused a complainant's information or complaint to be filed against any person, has in good faith cooperated with any law enforcement agency conducting a criminal investigation, has in good faith brought a civil proceeding against an employer or has testified in good faith at a civil proceeding or criminal trial.

"* * * * *

"(3) The remedies provided by this chapter are in addition to any common law remedy or other remedy that may be available to an employee for the conduct constituting a violation of this section."

[6] ORS 659A.001(3) provides:

"'Employee' does not include any individual employed by the individual's parents, spouse or child or in the *domestic service* of any person."

(Emphasis added.)

We agree with plaintiff that the legislative history of the private-employee-whistleblower statute is useful to our analysis, notwithstanding defendant's arguments that we should not look beyond the text of ORS 659A.230. First, even if our task here was only one of statutory interpretation, the legislative history is useful in our analysis and therefore we may consider it, even if the text is plain. *See State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009) (the court will consult proffered legislative history "even if the court does not perceive an ambiguity in the statute's text, where that legislative history appears useful to the court's analysis"). Second, the task before us is to delineate a common-law cause of action under the public-duty exception to at-will employment. In performing that task, legislative expressions of public policy are instructive. *Love*, 209 Or App at 492. To better understand those expressions, we will look to legislative history, after examining the text and context, when it is useful to our analysis.

In 1991, the legislature enacted House Bill (HB) 3435, codified as *former* ORS 659.550 (1991), *renumbered as* ORS 659A.230 (2001). By its text, the statute applied, without qualification, to "an employer['s]" employment practices relative to "an employee." Plaintiff notes that, in 1991, unlike the current version of ORS 659A.230, *former* ORS 659.550 was not limited by a definition of employee that excludes domestic service workers. Consequently, plaintiff contends that the plain meaning of "an employee" includes people employed as domestic service workers. Moreover, according to plaintiff, the history of HB 3435 demonstrates that the legislature intended the statute to apply to all employees and was particularly concerned with encouraging those employees to report and participate in the investigation of crimes involving child abuse.

Regarding the legislature's concern with employee reports of child abuse, plaintiff highlights the testimony of attorney Robert Durham. Durham was introduced by the bill's primary proponent, Representative Hedy Rijken, to "discuss the technical aspects of [the] bill." Tape Recording, House Labor Committee, HB 3435, Apr 15, 1991, Tape 101, Side B (statement of Rep Hedy Rijken). Durham testified

that the intent of the bill was to prevent employees from being "hammered for having made a good faith report of a drug buy, a child molestation, or sexual abuse in the work place." Tape Recording, House Labor Committee, HB 3435, Apr 15, 1991, Tape 101, Side B (statement of Robert Durham). Captain Dennis O'Donnell of the Oregon State Police, the only other person to testify regarding the bill, also discussed the bill's intended effect on investigations of child abuse. Discussing the difficulties of interviewing employees who feared retaliation for assisting police, O'Donnell testified:

> "I think of a child sexual [abuse] case that I was involved in down south in a community, through the church and through the school, where people were afraid to come forward and support some of the victim's testimony, some of the other corroborating evidence that we had. And as a result, it never did occur, because they were fearful of losing their job or position in the agency."

Tape Recording, House Labor Committee, HB 3435, Apr 15, 1991, Tape 101, Side B (statement of Dennis O'Donnell). That history supports plaintiff's contention that the legislature intended HB 3435 to specifically encourage employees to report crimes involving child abuse and participate in the investigations of those crimes.

As noted, plaintiff also argues that the legislature intended all employees, including domestic service workers, to fall within the protection of the bill. As indicated, plaintiff observes that HB 3435 contained no definition of the term "employee," and the legislature did not cross-reference any other statutory definition of "employee." *See, e.g., former* ORS 659.010 (1991) (stating that definitions provided in that statute, including a definition of "employee" that excludes domestic service workers, apply to statutes in ORS chapter 659 other than *former* ORS 659.550). Indeed, the legislature enacted the private-employee-whistleblower act in the next legislative term following the passage of the public-employee-whistleblower act. Like the private-employee-whistleblower act, the public-employee-whistleblower act was not subject to the definition of employee that excludes domestic service workers. *See former* ORS 659.510 (1991).

The legislative history further supports plaintiff's argument that the legislature intended the term "employee" in HB 3435 to include all employees. O'Donnell testified:

"This bill is a good common sense approach to encourage all people who are employed in this state to carry out their civic responsibility to report crime, to cooperate with law enforcement, and to testify in judicial proceedings. It also prohibits all employers from discouraging in any way employees from carrying out that responsibility."

Tape Recording, Senate Labor Committee, HB 3435, Apr 15, 1991, Tape 134, Side A (statement of Dennis O'Donnell).

Defendant does not identify contrary legislative history and we have found none. Instead, defendant argues that, regardless of the pubic policy expressed by the legislature with the enactment of *former* ORS 659.550, in light of ORS 659A.230, the current private-employee-whistleblower statute, and ORS 659A.001(3), which provides the definition of "employee" applicable to that statute, the present public policy of the State of Oregon is to encourage only workers other than domestic workers and individuals employed by the individual's parents, spouse, or child to report or discuss the crimes of their employer with law enforcement. Plaintiff responds that the legislature has never shown an intention to change the public policy from that expressed in 1991, despite its reorganization of ORS chapter 659 in 2001.

In 2001, at the request of the Bureau of Labor and Industries (BOLI) and the Office of Legislative Counsel, the Oregon Law Commission (commission) drafted House Bill (HB) 2352 (2001), which reorganized ORS chapter 659. Testimony, House Labor Committee, HB 2352, Mar 17, 1981, Ex G (providing overview of the commission purpose and process). BOLI had initially intended to introduce a bill to reorganize that chapter in the previous legislative session but, given the complexity of the task, ultimately enlisted the help of the commission. *Id.* The purpose of HB 2352 was to reorganize the statutes, place statutes that fell under BOLI's jurisdiction in a single chapter, and make those statutes easier to understand. *Id.*

In testimony on the bill, members of the commission and legislative counsel repeatedly stressed that HB 2352 was not intended to make any substantive changes to the law aside from extending a single statute of limitation to be consistent with the Oregon Torts Claim Act. The testimony of Jeff Carter, chair of the commission's workgroup that drafted the bill, is typical: "One of the mantras we had throughout this process was that we did not want to make any substantive changes. We really were looking at trying to make this a more user-friendly statute * * * so the purpose was to do the reorganization without any substantive changes." Tape Recording, House Judiciary Committee, HB 2352, Feb 16, 2001, Tape 9, Side A (statement of Jeff Carter).

In his testimony regarding HB 2352, the bill's drafter, David Heynderickx, Senior Deputy Legislative Counsel, also emphasized that the drafters' intention was to not change the substance of the law. He also discussed the highly technical language required to perform such a reorganization, noting that even members of the legislature would likely find the text of the bill confusing:

> "A lot of this bill, when you look at it, to some degree it's probably pretty hard for a lot of folks, including legislators, to figure out what's going on in some of these sections once you get past the black letter stuff at the beginning. Some of this, I guess, I would characterize as inside baseball for legislative counsel because in order to figure out what's going on here, it's almost better to go with the summaries that we provide rather than trying to figure it out from the language.

> "The concept here is basically to split the existing chapter 659 and create a chapter that has those things that are subject to BOLI jurisdiction in one chapter. Right now there is a mishmash of things that are subject to BOLI jurisdiction and things that are not. It's very confusing. It's very hard to understand * * *.

> "The one thing I would say on substantive versus—I just want to mention that the work group, I worked with them very closely—and I will say there was an extreme sensitivity to not making changes in substance. Perhaps more so than any other group I have worked with probably over the last few sessions. * * * [T]he one issue that has come up where there was a change in a statute of limitation I'm

aware of clearly that's a substantive change and I would tell you that the work group did not feel comfortable doing that and they took it to the full commission with a range of options."

Tape Recording, House Judiciary Committee, HB 2352, Feb 16, 2001, Tape 9, Side A (statement of David Heynderickx).

Defendant asserts that the plain text of HB 2352 is dispositive, arguing that, on its face, HB 2352 renumbered *former* ORS 659.550 as ORS 659A.230 and subjected that provision to the definition of employee contained in ORS 659A.100(3). To that end, defendant points to section 25 of HB 2352, a list of "series adjustments" that contains 83 individual statutes, including *former* ORS 659.550, that section 25 "add[s] to and [makes] part of section 1 to 15" of HB 2352. Or Laws 2001, ch 621, § 25. Specifically, defendant argues that, because section 25 of HB 2352 added *former* ORS 659.550 to sections 1 through 15 of HB 2352, the legislature changed the definition of employee as used in the private-employee-whistleblower act.

Even if that is the case, such a change is not determinative of the issue here: the public policy that gives rise to a cognizable wrongful discharge claim. *Love*, 209 Or App at 492. Plaintiff's claim here is a common-law claim; consequently, we do not address the effect the renumbering *former* ORS 659.550 as ORS 659A.230 might have on a claim brought under that statute. Our task, rather, is to delineate the common law based on, among other sources, the legislature's expression of public policy in statutes. In that task, "the sources of law that express *** 'public policy' must in *some* sense speak directly to [employees'] acts." *Lamson*, 346 Or at 638 (emphasis in original).

We conclude that, in 1991, with the passage of *former* ORS 659.550, the legislature expressed a public policy to encourage all employees with a good-faith belief that their employer had committed a crime involving child abuse to report that belief to law enforcement. In light of the fact that the undisputed intent of HB 2352, which renumbered *former* ORS 659.550, was to reorganize the civil rights statutes contained in ORS chapter 659 without altering the substantive rights contained therein, we conclude that that public

policy remains unchanged. Thus, because plaintiff alleged his wrongful discharge claim under the common-law public-duty exception to at-will employment, the court erred when it granted summary judgment in defendant's favor for the reason that plaintiff did not meet the statutory definition of employee contained in ORS 659A.001(3).

B. *Intentional infliction of emotional distress*

Plaintiff next argues that the trial court erred in granting defendant's motion for summary judgment on his claim for IIED. In the order granting that motion, the trial court stated that

> "even viewed in the light most favorable to plaintiff, defendant's alleged conduct did not rise to [the] level of 'extraordinary outrageous aggravating factors.' *Clemente* [*v. State of Oregon*,] 227 Or App 434[, 206 P3d 249] (2009). The court cannot perceive how a plaintiff who contends he was unwilling, was allegedly 'forced' to watch child pornography."

Plaintiff's argument is twofold. First, he contends that defendant "intentionally caused plaintiff to be continually exposed to child pornography in the course and scope of plaintiff's work," and that the evidence in the record is sufficient to carry that factual question forward to the jury. Second, plaintiff argues that, on this record, a jury could find that defendant's actions were an "extraordinary transgression of the bounds of socially tolerable conduct." Defendant responds that the evidence in the record does not support plaintiff's allegation that defendant exposed plaintiff to child pornography in the course of plaintiff's work duties and, even if the record does support those allegations, defendant's conduct was not sufficiently outrageous to present a jury question on that issue.

We readily agree with plaintiff that he adduced evidence sufficient to present a triable question of fact as to whether defendant continually exposed him to child pornography in the workplace. Plaintiff's testimony contained in his affidavit and provided above—that defendant repeatedly directed plaintiff to view images of child pornography while plaintiff served him breakfast in bed and repeatedly displayed child pornography on a monitor and other devices in

the same areas of the home where plaintiff was performing his work duties—would suffice to carry that factual question forward to the jury.

As we explain below, we also agree with plaintiff that he presented evidence of facts that are sufficiently outrageous to make out a *prima facie* case of IIED. An IIED claim requires plaintiff to prove three elements:

> "(1) that defendant[] intended to cause plaintiff severe emotional distress or knew with substantial certainty that [his] conduct would cause such distress; (2) that defendant[] engaged in outrageous conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendant['s] conduct in fact caused plaintiff severe emotional distress."

*House v. Hicks*, 218 Or App 348, 357-58, 179 P3d 730, *rev den*, 345 Or 381 (2008).

Whether conduct amounts to an actionable outrageous transgression of social norms is a fact-specific, case-by-case determination. *Lathrope-Olson v. Dept. of Transportation*, 128 Or App 405, 408, 876 P2d 345 (1994). Although it is the role of the jury to determine the extent of social norms, in the context of an IIED claim, the court may be required to determine whether no reasonable jury could find the defendant's conduct to have exceeded all bounds of socially tolerable harm. *Pakos v. Clark*, 253 Or 113, 132, 453 P2d 682 (1969); *see also Clemente*, 227 Or App at 442. Courts are more likely to consider behavior outrageous if it is inflicted on the more vulnerable partner in a "special relationship" such as employer-employee. *E.g.*, *Babick*, 333 Or at 413-14. However, managerial decisions that might give rise to conventional employment-related claims do not necessarily "qualify as intentional infliction of severe mental distress" unless they are also "the kind of aggravated acts of persecution that a jury could find beyond all tolerable bounds of civilized behavior." *Hall v. The May Department Stores*, 292 Or 131, 139, 637 P2d 126 (1981), *abrogated on other grounds by McGanty v. Straudenraus*, 321 Or 532, 901 P2d 841 (1995); *see also Clemente*, 227 Or App at 442.

*Clemente* is instructive on that point. In that case, the Department of Corrections (DOC) employed the plaintiff,

an attorney, as a hearings officer. She alleged that, because of her sex, DOC paid her less than her male counterparts; did not provide her with resources; made false accusations against her; and did not allow her to transport herself in her own car. *Id.* at 441. We held that, even assuming that, as an employee, plaintiff was "subjected to an insensitive, mean-spirited supervisor who might have engaged in gender-based, discriminatory treatment," those facts were not sufficiently aggravated to present a *prima facie* case for IIED, especially in the absence of evidence that the employee was "verbally, sexually, or physically abused or harassed," "exposed to violence," or "repeatedly and viciously ridiculed." *Id.* at 443.

Here, as noted, plaintiff testified by affidavit that defendant repeatedly requested that he view child pornography while he was performing his work duties, that defendant viewed and discussed child pornography in areas of the home where plaintiff was working, and that defendant apparently received sexual gratification from the experiences. Further, plaintiff alleges that defendant was aware that plaintiff found these images particularly objectionable because he is a victim of childhood sexual abuse.

We conclude that the evidence in this record is distinguishable from that in *Clemente*, because here, the evidence in the record is sufficient to support a reasonable finding that defendant's actions were not managerial decisions—or even managerial decisions tainted by bias—but were of a different nature altogether. Indeed, defendant's actions were sufficiently aggravated to present a jury question as to whether defendant's conduct was outrageous enough to constitute IIED because, unlike the plaintiff in *Clemente*, were plaintiff to prove his allegations, a reasonable jury could find that defendant's actions constitute the sort of aggravated acts that violate social norms in the workplace beyond all tolerable bounds of civilized behavior. *Id.*

C. *Conversion*

Plaintiff next argues that the trial court erred in granting summary judgment in favor of defendant on plaintiff's claim for conversion because a genuine issue of material fact exists as to that claim. Defendant conceded as much

at a hearing on the parties' motions for summary judgment when he stated, "defendant has conceded that there's a genuine issue in material fact [as to plaintiff's claim of conversion]. And so that [motion for summary judgment on that claim] is no longer before the court." However, in its limited judgment, the trial court granted summary judgment for defendant on plaintiff's conversion claim, stating, "The allegations are not supported by plaintiff's actions as revealed by deposition excerpts attached by defendant."

For plaintiff's claim of conversion to survive defendant's motion for summary judgment, he must produce evidence that would enable a reasonable factfinder to find an "intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Becker v. Pacific Forest Industries, Inc.*, 229 Or App 112, 116, 211 P3d 284 (2009).

As noted, plaintiff presented evidence that, when he attempted to retrieve his possessions from defendant's home, defendant's personal assistants barred him from entering defendant's residence, stating that defendant did not want him on the property. Moreover, defendant refused to return those possessions after plaintiff's attorney sent a letter demanding their return. As defendant conceded below, these facts are sufficient to present a triable question of fact on the conversion claim. Consequently, the court's grant of summary judgment on that claim was error.

## III. CONCLUSION

In sum, we conclude that the trial court erred in granting defendant summary judgment on plaintiff's claim for wrongful discharge, because the public policy of the state of Oregon encourages all employees with a good-faith belief that their employer has committed a crime involving child abuse to report that belief to law enforcement. Consequently, plaintiff is not required to show that he meets the statutory definition of employee under ORS 659A.001(3) to prevail on his common-law claim for wrongful discharge. We also we conclude that the trial court erred in granting defendant's summary judgment motion on plaintiff's claims of IIED and

conversion, because the record is sufficient to present triable questions of fact on each of those claims.

Reversed and remanded as to claims of wrongful discharge, intentional infliction of emotional distress, and conversion; otherwise affirmed.